# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
------------------------------------------------------------------X
829 REALTY LLC,

                                     Plaintiff,

               - against -

MEIR GUTFREUND, individually and as trustee of
PD FAMILY CREDIT SHELTER TRUST,

                                Defendant.
------------------------------------------------------------------X

Index No.:
Date Purchased:

**SUMMONS**

Venue is based on CPLR 503(a)
and 509. Plaintiff designates
Kings County as the place of trial.

To the above-named defendant:

       YOU ARE HEREBY SUMMONED to answer the verified complaint in this action and

to serve a copy of your answer or, if the verified complaint is not served with this summons, to

serve a notice of appearance on the plaintiff's attorney within 20 days after the service of this

summons, exclusive of the day of service (or within 30 days after the service is complete if this

summons is not personally delivered to you within the State of New York). In case of your

failure to appear or answer, judgment will be taken against you by default for the relief

demanded in the verified complaint.

Dated: Uniondale, New York
       August 14, 2011

                                WESTERMAN BALL EDERER
                                MILLER & SHARFSTEIN, LLP

               By:     _____

                                Jeffrey A. Miller, Esq.
                                1201 RXR Plaza
                                Uniondale, New York 11556
                                (516) 622-9200
                                *Attorneys for Plaintiff*

TO:    Meir Gutfreund, individually and as
       trustee of PD Family Credit Shelter Trust
       1938 53rd Street
       Brooklyn, New York 11204

{00472678}

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

-----------------------------------------------------------------X    Index No:

829 REALTY LLC,

Plaintiff,

- against -                                          **VERIFIED COMPLAINT**

MEIR GUTFREUND, individually and as trustee of
PD FAMILY CREDIT SHELTER TRUST,

Defendant.

-----------------------------------------------------------------X

Plaintiff, by its attorneys, Westerman Ball Ederer Miller & Sharfstein, LLP, complaining

of the defendant herein, respectfully states as follows:

## THE PARTIES

1.      Plaintiff 829 Realty LLC ("Plaintiff") is a New York limited liability company.

2.      Defendant Meir Gutfreund ("Defendant") is the trustee of PD Family Credit
Shelter Trust, which is a 33% member of Plaintiff.

3.      The members of Plaintiff are:  SF Family Credit Shelter Trust (33% interest); PD
Family Credit Shelter Trust (33% interest); Ortel Plaza LLC (33% interest); and FSG Realty
Associates LLC (1% interest).

## FACTS

4.      Plaintiff is the owner of an apartment building located at 829 Greenwood Avenue,
Brooklyn, New York (the "Property").

5.      In or about May 2001, Plaintiff borrowed the principal sum of $8,000,000.00
from GMAC Commercial Mortgage Corp. (the "Loan").

6.      The Loan is secured by a mortgage on the Property.

7.      The maturity date of the Loan was June 5, 2011.

8.      Prior to the maturity date, Plaintiff began negotiations with Flushing Savings Bank ("FSB") to refinance the Loan.

9.      On or about April 22, 2011, FSB provided Plaintiff with a commitment letter regarding the refinancing of the Loan.

10.     On or about May 23, 2011, Defendant, on behalf of PD Family Credit Shelter Trust, filed in the Office of the City Register of the City of New York a Certificate of Declaration (the "Certificate"), objecting to, among other things, any refinancing of the Property without Defendant's written consent.

11.     Neither FSB nor any other lender would close on a refinancing unless the Certificate was cancelled, which Defendant refused to do despite demand.

12.     The Certificate is improper and should be cancelled.

13.     Neither Defendant's consent nor the consent of PD Family Credit Shelter Trust was or is required to approve the refinancing of the Loan.

14.     Under the terms of the Operating Agreement, in order to approve the refinancing, all that is required is the affirmative vote of members holding a simple majority (over 50 percent) of the membership interests.

15.     All of the members other than PD Family Credit Shelter Trust have approved the refinancing of the Property.

16.     Since members holding more than 50% of the membership interests approve the refinancing of the Loan, Defendant's consent (and/or the consent of PD Family Credit Shelter Trust) to refinance the Property was not and is not required.

17.     The Certificate has created a cloud on the title of the Property.

18.     The Certificate is preventing Plaintiff from refinancing the Property (with FSB or

any other lender) and otherwise causing harm to Plaintiff including, without limitation, the accrual of default interest on the Loan.

**AS AND FOR A FIRST CAUSE OF ACTION**
**(Cancellation of Certificate)**

19.    Plaintiff incorporates the foregoing paragraphs of this Verified Complaint by reference as if the same were set forth at length herein.

20.    Pursuant to Section 329 of the Real Property Law, "an owner of real property or of any undivided part thereof or interest therein . . . may maintain an action to have any recorded instrument in writing relating to such real property or interest therein, other than those required by law to be recorded, . . . declared void or invalid, or to have the same canceled of record as to said real property."

21.    Plaintiff is the owner of the Property.

22.    The Certificate has been recorded against the Property.

23.    The Certificate is not required by law to be recorded.

24.    The Certificate is not entitled to be recorded under Section 291 of the Real Property Law or under any other statute, rule or regulation.

25.    The Certificate has placed a cloud on title to the Property and is preventing Plaintiff from refinancing the Property.

26.    As a direct and proximate result of Defendant's conduct, Plaintiff is suffering harm.

27.    Plaintiff has no adequate remedy at law.

28.    Plaintiff is entitled to an order:  (i) directing the New York City Registrar to immediately cancel and vacate the Certificate of record as against the Property; and (ii) awarding Plaintiff all sums incidental to Defendant's misconduct.

3

## AS AND FOR A SECOND CAUSE OF ACTION
### (Breach of Fiduciary Duty)

29.     Plaintiff incorporates the foregoing paragraphs of this Verified Complaint by reference as if the same were set forth at length herein.

30.     Defendant owes a fiduciary duty to Plaintiff.

31.     Defendant has breached its fiduciary duty to Plaintiff by, among other things, recording the Certificate, refusing to vacate the Certificate, and interfering with Plaintiff's ability to refinance the Loan.

32.     As a direct and proximate result of Defendant's conduct, Plaintiff is suffering harm.

33.     Plaintiff has no adequate remedy at law.

34.     Defendant's actions are willful, wanton and outrageous, and warrant the imposition of punitive damages.

**WHEREFORE**, Plaintiff demands judgment against Defendant as follows:

a.     On the first cause of action, for an order (i) directing the New York City Registrar to immediately cancel and vacate the Certificate of record as against the Property; and (ii) awarding Plaintiff all sums incidental to Defendant's misconduct;

b.     On the second cause of action, for an order (i) directing the New York City Registrar to immediately cancel and vacate the Certificate of record as against the Property; (ii) awarding Plaintiff all sums incidental to Defendant's misconduct; and (iii) imposing punitive damages against Defendant in an amount to be determined at trial; and

4

c.     On all causes of action, for an award of the costs, disbursements, counsel fees, and other expenses incurred by Plaintiff in this action, together with such other and further relief as the Court deems just and proper.

Dated: Uniondale, New York
       August 14, 2011

WESTERMAN BALL EDERER
MILLER & SHARFSTEIN, LLP

By: _____
       Jeffrey A. Miller, Esq.
       1201 RXR Plaza
       Uniondale, New York 11556
       (516) 622-9200
       *Attorneys for Plaintiff*

472691

## VERIFICATION

Shaindel Finkelstein affirms under penalty of perjury as follows:

I am a Trustee of the SF Family Credit Shelter Trust, a member of the plaintiff herein. I have read the foregoing Verified Complaint and know the contents thereof and the same are true to my knowledge, except those matters therein which are stated to be alleged upon information and belief, and as to those matters I believe them to be true.

_____
SHAINDEL FINKELSTEIN

Affirmed to before me this
14th day of August, 2011

_____
Notary Public

GEDALIA MARYL
Notary Public - State of New York
No. 01MA6226310
Qualified in Kings County
My Commission Expires August 9, 2014

6

## **VERIFICATION**

Israel Finkelstein affirms under penalty of perjury as follows:

I am the manager of Ortel Plaza LLC, a member of the plaintiff herein. I have read the foregoing Verified Complaint and know the contents thereof and the same are true to my knowledge, except those matters therein which are stated to be alleged upon information and belief, and as to those matters I believe them to be true.

_____
ISRAEL FINKELSTEIN

Affirmed to before me this
14th day of _August_ , 2011

_____
Notary Public

GEDALIA MARYL
Notary Public - State of New York
No. 01MA6226310
Qualified in Kings County
My Commission Expires August 9, 20 1 4

7

Case 1-12-01148-jf   Doc 1-7   Filed 04/30/12   Entered 04/30/12 11:38:16

INDEX NO. 500665/2011

RECEIVED NYSCEF: 08/31/2011

**AFFIDAVIT OF JEFFREY A. MILLER, ESQ.**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
-------------------------------------------------------------------X    Index No: 500665/11
829 REALTY LLC,

Plaintiff,

- against -

**AFFIDAVIT OF
JEFFREY A. MILLER, ESQ.
IN SUPPORT OF MOTION**

MEIR GUTFREUND, individually and as trustee of
PD FAMILY CREDIT SHELTER TRUST,

Defendant.
-------------------------------------------------------------------X

STATE OF NEW YORK    )
                     ) ss:
COUNTY OF NASSAU     )

JEFFREY A. MILLER, being duly sworn, deposes and states:

1.      I am a partner in the law firm of Westerman Ball Ederer Miller & Sharfstein,

LLP, counsel for plaintiff. I respectfully submit this affidavit in support of plaintiff's application

for injunctive relief.

## PRELIMINARY STATEMENT

2.      Plaintiff needs the Court's assistance. It owns an apartment building at 829

Greenwood Avenue, Brooklyn, New York (the "Property") and its mortgage loan has matured –

Plaintiff now owes its lender more than $7 million. The lender has declared the loan in default.

*See* Exhibit "A". If Plaintiff does not refinance its loan, it risks losing the mortgaged Property in

foreclosure. But for Defendant's interference, Plaintiff can easily refinance its loan and avoid

forfeiture of the Property to its lender. Unfortunately, Defendant, the trustee of a trust that owns

a minority membership interest in Plaintiff, is wrongfully interfering with Plaintiff's ability to

refinance.

3.      Over the last few months, Plaintiff had negotiated a refinancing with Flushing

Savings Bank ("FSB"). In April 2011, FSB sent Plaintiff a commitment letter outlining the terms of the refinancing. *See* Exhibit "B".

4.      For some reason, Defendant is wrongfully blocking the refinancing. In May 2011, Defendant filed with the Office of the City Register of the City of New York and against the Property a document that he made up -- a so-called "Certificate of Declaration" (the "Certificate"). *See* Exhibit "C". According to the Certificate, Defendant objects to, among other things, any mortgaging or pledging of the Property without Defendant's written consent.

5.      The Certificate is completely improper. Indeed, under Plaintiff's operating agreement (the "Operating Agreement"), all that is required in order to approve the refinancing is the consent of a simple majority – more than 50% of the membership interests. *See* Exhibit "D" at § 5.2.2. That simple majority exists here. Indeed, members collectively holding a 67% interest in Plaintiff consent to the refinancing. Only Defendant's trust (a 33% member of Plaintiff) objects. But Defendant has no veto power to overrule the will of the majority.

6.      This matter is urgent. The Certificate is placing a cloud on the title to the Property. FSB would not go forward with the refinancing unless the Certificate was cancelled, which Defendant refused to do. As long as the Certificate is of record, Plaintiff cannot refinance its loan with FSB or any other lender. As stated, the loan is past its maturity date and will now fall into foreclosure.

7.      Although it is not entirely clear, Defendant's objection to the refinancing apparently stems from its (equally baseless) objection to a former member's transfer of his membership interest in Plaintiff. The original members of Plaintiff were: SF Family Credit Shelter Trust (33% interest)[1]; Defendant's trust (33% interest); Pinchos Shemano ("Shemano")

---

[1] Shaindel Finkelstein is trustee of the SF Family Credit Shelter Trust. *See* Affirmation of Shaindel Finkelstein.

(33% interest); and FSG Realty Associates LLC (1% interest).[2]

8.      Section 6.2 of the Operating Agreement expressly allows a member to transfer its interest to another member, a family member and/or an affiliate.  In accordance with the Operating Agreement, Shemano sold and assigned his 33% membership interest to SF Family Credit Shelter Trust (*see* Exhibit "E"); SF Family Credit Shelter Trust thereafter assigned a 33% interest to Yocheved Orlinsky ("Orlinsky") and Miriam Telowitz ("Telowitz"), who are beneficiaries of the trust and family members (grandchildren) of the trustee of the trust (*see* Exhibit "F"); and Orlinsky and Telowitz assigned that interest to Ortel Plaza LLC, a company solely owned by Orlinsky and Telowitz (*see* Exhibit "G").  *See also* Affirmations of Shaindel Finkelstein (trustee of the SF Family Credit Shelter Trust) and Israel Finkelstein (manager of Ortel).

9.      All of the members other than Defendant's trust (*i.e.*, SF Family Credit Shelter Trust, Ortel Plaza LLC, and FSG Realty Associates LLC, all of which collectively hold a 67% interest in Plaintiff) have approved the refinancing of the Property. *See* Affirmations of Shaindel Finkelstein (on behalf of SF Family Credit Shelter Trust) and Israel Finkelstein (on behalf of Ortel Plaza LLC).  Moreover, even if Shemano's transfer of his membership interest is deemed invalid (meaning that he is still a member of Plaintiff), he has consented to the refinancing and has indicated that he wants Defendant's Certificate canceled of record. *See* Shaindel Finkelstein Aff. at ¶ 9.  Likewise, even if the assignment from SF Family Credit Shelter Trust is deemed invalid, that would simply mean that such interest is still held by SF Family Credit Shelter Trust, which consents to the refinancing and wants the Certificate canceled of record. *Id.*

10.      Since members holding more than 50% of the membership interests approve the

---

[2] The members of FSG Realty Associates LLC are:  SF Family Credit Shelter Trust (33% interest); Defendant's trust (33% interest); and Ortel Plaza LLC (34% interest). *See* Shaindel Finkelstein Aff. at ¶ 7 n. 1.

refinancing of the Loan, the Operating Agreement of 829 Realty LLC -- the controlling document -- provides that Defendant's consent to refinance the Property was not and is not required. *See* Exhibit "D" at § 5.2.2.

11.     Defendant's actions are effectively holding Plaintiff and the Property hostage -- if this continues, the Property will be foreclosed by the lender. The existing mortgage loan is in default, and interest is accruing at the default rate of 12.91% per year. *See* Exhibit "H" (showing that the initial interest rate was 7.91% per year) and Exhibit "I" (a copy of the promissory note which states, in section 4.03, that the default interest rate is equal to the regular interest rate plus 5%). But Plaintiff is being wrongfully prevented from refinancing. Any new loan/refinancing would have a significantly reduced interest rate of approximately 4.75% per year (the rate FSB stated in its commitment letter, Exhibit "B"). Respectfully, Defendant's conduct should not be tolerated. The Certificate should be cancelled of record.

## FACTUAL BACKGROUND

12.     For a full recitation of the facts of this case, the Court is respectfully referred to the Verified Complaint (Exhibit "J") and the accompanying affirmations of Shaindel Finkelstein and Israel Finkelstein.

## LEGAL ARGUMENT

## POINT I

## STANDARDS FOR PRELIMINARY INJUNCTION

13.     The standards on a motion for a preliminary injunction are well settled. Such a motion should be granted where the movant establishes: (i) a likelihood of success on the merits; (ii) irreparable harm in the absence of such relief; and (iii) that the balance of the equities favors granting such relief. *See, e.g., Brenner v. Hart Sys., Inc.*, 114 A.D.2d 363, 366, 493 N.Y.S.2d

4

881, 884 (2d Dep't 1985). As discussed below, all of these elements are satisfied here.

**A.      Plaintiff is likely to succeed on the merits**

14.      Simultaneously with this application, Plaintiff has filed a Summons and Verified Complaint (Exhibit "J), asserting two causes of action:  (i) cancellation of the Certificate under Section 329 of the Real Property Law; and (ii) breach of fiduciary duty.  Plaintiff is more than likely to succeed on the merits of these claims.

**(i)      Section 329 of the Real Property Law**

15.      Section 329 of the Real Property Law provides as follows:

> An owner of real property or of any undivided part thereof or interest therein or an owner of rent to accrue from a tenancy or subtenancy thereof, may maintain an action to have any recorded instrument in writing relating to such real property or interest therein, **other than those required by law to be recorded**, or any recorded assignment of rent to accrue from a tenancy or subtenancy of such property or interest therein declared void or invalid, or to have the same canceled of record as to said real property, or his undivided part thereof or interest therein, or as to the rent to accrue therefrom belonging to him. (emphasis added).

16.      Under this statute, "an owner of real property may maintain an action to have any instrument in writing relating to such real property which has been improperly recorded cancelled as of record." *Newpar Estates v. Barilla*, 4 A.D.2d 186, 187, 164 N.Y.S.2d 132, 133 (1st Dep't 1957)

17.      **Importantly, the standard for cancelling a document of record under Section 329 is not a strict one**.  Such cancellation is appropriate as long as the document is not one that is required by law to be recorded. *See, e.g.*, 2 N.Y. Law & Prac. of Real Prop. § 28:42 (2d ed.) ("Under this statute, the only question to be determined is whether or not the instrument sought to be cancelled is one which is not required by law to be recorded."); *Davidson v. Fox*, 65 A.D. 262, 73 N.Y.S. 533, 534 (1st Dep't 1901) (explaining that "the only question to be determined in

5

this case is whether or not the instrument recorded by the defendant is such an instrument as is not required by law to be recorded"); *Puglisi v. Belasky*, 118 Misc. 336, 338, 193 N.Y.S. 357, 360 (Sup. Ct. Kings County 1922) (explaining that Section 329 "not only permits an action to have the instrument declared void, but warrants an action to have the instrument canceled of record when it is not required by law to be recorded").

18.     Moreover, in any situation where an instrument is not required by law to be recorded, Section 329 "gives relief without consideration of . . . equitable principles," and "even though the record may not constitute a cloud upon title." *Puglisi*, 118 Misc. at 338-39, 193 N.Y.S. at 360.

19.     In this case, the Certificate is certainly not a document that must be recorded. *See* Real Property Law § 291, *et seq.* (listing types of documents that are required by law to be recorded); *Pape v. Pape*, 39 Misc.2d 268, 269, 240 N.Y.S.2d 501, 502 (Sup. Ct. Nassau County 1963) (granting a motion to cancel of record a "declaration of intention" that a piece of property was not to be sold or encumbered "until the marital problems of the parties were solved" that "was not in recordable form, and there is no authority to sustain its recordation"); *Davidson*, 65 A.D. at 262, 73 N.Y.S. at 535 (directing the New York City Registrar to cancel of record a contract for the alteration of a building because no law required such a contract to be recorded).

20.     Accordingly, the Certificate should be cancelled under Section 329.

**(ii)     Breach of fiduciary duty**

21.     A member of a limited liability company owes a fiduciary duty to the company. *See, e.g., Weidberg v. Barnett*, 752 F. Supp.2d 301, 307 (E.D.N.Y. 2010) (explaining that under New York law, "members and managers of limited liability companies owe fiduciary duties not just to the LLC, but also directly to the members of the LLC"); *Willoughby Rehabilitation and*

6

*Health Care Center, LLC v. Webster*, No. 12431-04, 13 Misc.3d 1230(A), 831 N.Y.S.2d 357 (Table), 2006 WL 3068961, at *7 (Sup. Ct. Nassau County Oct. 26, 2006) (Austin, J.) (discussing the "fiduciary duty owed by a member of a limited liability company to the company and other members"), *aff'd*, 46 A.D.3d 801, 849 N.Y.S.2d 887 (2d Dep't 2007).

22.     Defendant is breaching that duty here. As discussed, Defendant is harming the company by preventing it from refinancing its mortgage loan. As a result of Defendant's actions, the loan is in default and will fall into foreclosure, and Plaintiff may lose its main asset – the Property. This is a textbook case of breach of fiduciary duty. *See, e.g., Gangemi v. Grancio*, No. 6508/05, 19 Misc.3d 1127(A), 866 N.Y.S.2d 92 (Table), 2008 WL 1914512, at *5 (Sup. Ct. Kings County Apr. 17, 2008) (Rothenberg, J.) (holding that complaint sufficiently stated cause of action by alleging that shareholder breached fiduciary duty to corporation by sabotaging settlement agreement in foreclosure action against corporation which placed the corporation in a financially detrimental position and subjected the corporation to the threat of losing its property).

23.     Respectfully, Plaintiff's eventual success on the merits of its claims is very likely.

**B.     Plaintiff will suffer irreparable harm if injunctive relief is denied**

24.     If the requested injunction is denied, then the Certificate will remain of record and Plaintiff will not be able to refinance its mortgage loan. This is putting Plaintiff and the Property at risk. Indeed, Plaintiff's only business relates to the Property. If an injunction is not issued, Plaintiff may very well lose the Property in foreclosure and go out of business. This type of harm is considered "irreparable" for purposes of granting injunctive relief. *See, e.g., Kelley v. Garuda*, 36 A.D.3d 593, 596, 827 N.Y.S.2d 293, 295 (2d Dep't 2007) (holding that organization would suffer irreparable harm if its interest in its real property was lost). *See also Third Church of Christ, Scientist, of New York City v. City of New York*, 617 F.Supp.2d 201, 215 (S.D.N.Y.

2008) ("The deprivation of an interest in real property constitutes irreparable harm."). *See* also *John B. Hull, Inc. v. Waterbury Petroleum Products, Inc.*, 588 F.2d 24, 28-29 (2d Cir. 1994) (holding that "[a] threat to the continued existence of a business can constitute irreparable injury"); *Project Orange Assocs., LLC v. General Elec. Intern., Inc.*, 23 Misc.3d 764, 771-72, 872 N.Y.S.2d 857, 863 (Sup. Ct. N.Y. County 2009) (holding that plaintiff will be irreparably harmed if plaintiff loses its business).

**C.    The balance of the equities favors plaintiff**

25.    As discussed, if an injunction is not issued, the harm to Plaintiff will be irreparable. In contrast, if an injunction is granted, Defendant will not be harmed at all. Indeed, the injunction will actually help Defendant too. Defendant, a minority owner of Plaintiff, certainly would not benefit if the Property goes into foreclosure and Plaintiff goes out of business. Defendant would also benefit if the mortgage debt is refinanced, and the loan interest rate is reduced from the default rate of 12.91% per year to approximately 4.75% per year (the interest rate FSB stated in its commitment letter, Exhibit "B"). That is what makes Defendant's actions so puzzling – it is not only hurting Plaintiff, but it is also hurting Defendant.

26.    For these reasons, the balance of the equities strongly favors granting the requested relief.

27.    No prior request for the relief sought herein has been made before this or any other court.

28.    Pursuant to 22 NYCRR § 130-1.1a, the undersigned, an attorney admitted to practice in the courts of the State of New York, certifies that, upon information and belief, and after reasonable inquiry, the contentions contained herein and in the annexed documents are not frivolous.

**WHEREFORE**, on behalf of plaintiff, I respectfully request that the Court grant this application in all respects.

_____
JEFFREY A. MILLER

Sworn to before me this
18 day of _August_, 2011

_____
Notary Public

472721                    LINDA KLEMBALLA
            NOTARY PUBLIC, STATE OF NEW YORK
              NO. 01KL6130742, SUFFOLK COUNTY
                TERM EXPIRES JULY 18, 2013

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
------------------------------------------------------------------X
829 REALTY LLC,                                                      Index No.: 500665/11

                              Plaintiff,

                                                                    **NOTICE OF MOTION**

                - against -
                                                                    Return Date:  September 20, 2011

MEIR GUTFREUND, individually and as trustee of
PD FAMILY CREDIT SHELTER TRUST,

                              Defendant.
------------------------------------------------------------------X

**PLEASE TAKE NOTICE** that upon the annexed affidavit of Jeffrey A. Miller, Esq.,

sworn to on August 18, 2011, the annexed affirmation of Shaindel Finkelstein dated August 14,

2011, the annexed affirmation of Israel Finkelstein dated August 14, 2011, and the exhibits

thereto, and upon all of the pleadings and proceedings had herein, plaintiff will move this Court

at the Courthouse located at 360 Adams Street, Brooklyn, New York on the 20th day of

September, 2011, at 9:30 a.m., or as soon thereafter as counsel can be heard, for an order

pursuant to Real Property Law Section 329 and CPLR 6301 and 6311:

> (a)     cancelling of record the Certificate of Declaration filed by defendant on or
>         about May 23, 2011 against plaintiff's real property located at 829
>         Greenwood Avenue, Brooklyn, New York (Block 5279, Lot 43); and
>
> (b)     granting plaintiff such other and further relief as the Court deems just,
>         proper and equitable.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to CPLR 2214(b), any answering affidavits and any notice of cross-motion and supporting papers must be served on the undersigned at least seven days prior to the return date of this motion.

Dated: August 18, 2011
       Uniondale, New York

                     WESTERMAN BALL EDERER
                     MILLER & SHARFSTEIN, LLP

       By:         _____
                     Jeffrey A. Miller, Esq.
                     1201 RXR Plaza
                     Uniondale, New York 11556
                     (516) 622-9200
                     *Attorneys for Plaintiff*

TO:    Meir Gutfreund, individually and as
       trustee of PD Family Credit Shelter Trust
       1938 53rd Street
       Brooklyn, New York 11204

486351

RECEIVED NYSCEF: 08/31/2011

# AFFIRMATION OF SHAINDEL FINKELSTEIN

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
-----------------------------------------------------------------X    Index No:
829 REALTY LLC,

Plaintiff,

- against -

**AFFIRMATION OF
SHAINDEL FINKELSTEIN IN
SUPPORT OF MOTION**

MEIR GUTFREUND, individually and as trustee of
PD FAMILY CREDIT SHELTER TRUST,

Defendant.
-----------------------------------------------------------------X

SHAINDEL FINKELSTEIN affirms under penalty of perjury as follows:

1.     I am a trustee of the SF Family Credit Shelter Trust, which is a member of
Plaintiff. I respectfully submit this affirmation in support of Plaintiff's application for injunctive
relief.

2.     Plaintiff needs the Court's assistance. It owns an apartment building at 829
Greenwood Avenue, Brooklyn, New York (the "Property") and its mortgage loan has matured –
Plaintiff now owes its lender more than $7 million. The lender has declared the loan in default.
*See* Exhibit "A". If Plaintiff does not refinance its loan, it risks losing the mortgaged Property in
foreclosure. Unfortunately, Defendant, the trustee of a trust that owns a minority membership
interest in Plaintiff, is wrongfully interfering with Plaintiff's ability to refinance.

3.     Over the last few months, Plaintiff had negotiated a refinancing with Flushing
Savings Bank ("FSB"). In April 2011, FSB sent Plaintiff a commitment letter outlining the
terms of the refinancing. *See* Exhibit "B".

4.     For some reason, Defendant is wrongfully blocking any refinancing. In May
2011, Defendant filed with the Office of the City Register of the City of New York a so-called
"Certificate of Declaration" (the "Certificate") against the Property. *See* Exhibit "C". According

to the Certificate, Defendant objects to, among other things, any mortgaging or pledging of the Property without Defendant's written consent.

5.      The Certificate is completely improper.    Indeed, under Plaintiff's operating agreement (the "Operating Agreement"), all that is required in order to approve the refinancing is the consent of a simple majority – more than 50% of the membership interests.  *See* Exhibit "D" at § 5.2.2.  That simple majority exists here.  Indeed, members collectively holding a 67% interest in Plaintiff consent to the refinancing.   Only Defendant's trust (a 33% member of Plaintiff) objects.  But Defendant has no veto power to overrule the will of the majority.

6.      This matter is urgent.  The Certificate is placing a cloud on the title to the Property.  FSB would not go forward with the refinancing unless the Certificate was cancelled, which Defendant refused to do.  As long as the Certificate is of record, Plaintiff cannot refinance its loan with FSB or any other lender.  As stated, the loan is past its maturity date and will now fall into foreclosure.

7.      Although it is not entirely clear, Defendant's objection to the refinancing apparently stems from its (equally baseless) objection to a former member's transfer of his membership interest in Plaintiff. The original members of Plaintiff were:  SF Family Credit Shelter Trust (33% interest); Defendant's trust (33% interest); Pinchos Shemano ("Shemano") (33% interest); and FSG Realty Associates LLC (1% interest).[1]

8.      Section 6.2 of the Operating Agreement expressly allows a member to transfer its interest to another member, a family member and/or an affiliate.   In accordance with the Operating Agreement, Shemano assigned his 33% membership interest to another member, SF Family Credit Shelter Trust (*see* Exhibit "E"); SF Family Credit Shelter Trust assigned a 33%

---

[1] The members of FSG Realty Associates LLC are:  SF Family Credit Shelter Trust (33% interest); Defendant's trust (33% interest); and Ortel Plaza LLC (34% interest).

interest to Yocheved Orlinsky ("Orlinsky") and Miriam Telowitz ("Telowitz"), who are beneficiaries of the trust and family members (my grandchildren) (*see* Exhibit "F"); and Orlinsky and Telowitz assigned that interest to Ortel Plaza LLC, a company solely owned by Orlinsky and Telowitz (*see* Exhibit "G").

9.    All of the members other than Defendant's trust (*i.e.*, SF Family Credit Shelter Trust, Ortel Plaza LLC, and FSG Realty Associates LLC, all of which collectively hold a 67% interest in Plaintiff) have approved the refinancing of the Property.   Moreover, even if Shemano's transfer of his membership interest is deemed invalid (which is impossible because he was expressly allowed under § 5.2.2 of the Operating Agreement to transfer his interest to SF Family Credit Shelter Trust, a co-member of the company), Shemano has consented to the refinancing and has indicated that he wants Defendant's Certificate canceled of record. Likewise, even if the assignment from SF Family Credit Shelter Trust is deemed invalid (which, again can't be possible because it was in accordance with § 5.2.2 of the Operating Agreement), that would simply mean that such interest is still held by SF Family Credit Shelter Trust, which consents to the refinancing and wants the Certificate canceled of record.

10.    Since members holding more than 50% of the membership interests approve the refinancing of the Loan, Defendant's consent to refinance the Property was not and is not required under the Operating Agreement.

11.    Defendant's actions are effectively holding Plaintiff and the Property hostage. The existing mortgage loan is in default, and interest is accruing at the default rate of 12.91% per year.[2]   Plaintiff is being wrongfully prevented from refinancing.   Any new loan/refinancing would have a significantly reduced interest rate of approximately 4.75% per year (the interest

---

[2] *See* Exhibit "H" (showing that the initial interest rate was 7.91% per year) and Exhibit "I" (a copy of the promissory note which states, in section 4.03, that the default interest rate is equal to the regular interest rate plus 5%).

rate FSB stated in its commitment letter, Exhibit "_B_"). Respectfully, Defendant's conduct should not be tolerated. The Certificate should be cancelled of record.

**WHEREFORE**, on behalf of plaintiff, I respectfully request that the Court grant this application in all respects, and grant plaintiff such other and further relief as the Court deems just and proper.

kings county
state of NY

_SHAINDEL FINKELSTEIN_

Affirmed to before me this
14th day of _August_, 2011

Notary Public

GEDALIA MARYL
Notary Public - State of New York
No. 01MA6226310
Qualified in Kings County
My Commission Expires August 9, 20_14_

472727-7

# AFFIRMATION OF ISRAEL FINKELSTEIN

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
--------------------------------------------------------------------X   Index No:

829 REALTY LLC,

Plaintiff,

- against -

**AFFIRMATION OF ISRAEL
FINKELSTEIN IN SUPPORT
OF MOTION**

MEIR GUTFREUND, individually and as trustee of
PD FAMILY CREDIT SHELTER TRUST,

Defendant.
--------------------------------------------------------------------X

Israel Finkelstein affirms under penalty of perjury as follows:

1.      I am the manager of Ortel Plaza LLC ("Ortel"). The members of Ortel are Yocheved Orlinsky and Miriam Telowitz, who are grandchildren of Shaindel Finkelstein. Ortel is a member of Plaintiff. I respectfully submit this affirmation in support of Plaintiff's application for injunctive relief.

2.      Plaintiff owns an apartment building at 829 Greenwood Avenue, Brooklyn, New York (the "Property") and its mortgage loan has matured – Plaintiff now owes its lender more than $7 million. The lender has declared the loan in default. *See* Exhibit "A". If Plaintiff does not refinance its loan, it risks losing the mortgaged Property in foreclosure.

3.      Ortel consents to the refinancing of the loan. Indeed, there is no good reason not to do so. Unfortunately, Defendant, the trustee of a trust that owns a minority membership interest in Plaintiff, is wrongfully interfering with Plaintiff's ability to refinance.

4.      The Certificate that Defendant filed has created a cloud on the title and is preventing us from refinancing the Property. We respectfully request that the Certificate be cancelled of record.

**WHEREFORE**, on behalf of plaintiff, I respectfully request that the Court grant this application in all respects, and grant plaintiff such other and further relief as the Court deems just and proper.

Israel Finkelstein

Affirmed to before me this
14 day of ___August___, 2011

Notary Public

GEDALIA MARYL
Notary Public - State of New York
No. 01MA6226310
Qualified in Kings County
My Commission Expires August 9, 20 14

482952-4

**EXHIBIT A**

# ZEICHNER ELLMAN & KRAUSE LLP

575 LEXINGTON AVENUE

NEW YORK, NEW YORK 10022

(212) 223-0400

FAX: (212) 753-0396

www.zeklaw.com

35 MASON STREET
GREENWICH, CT 06830
(203) 622-0900
FAX: (203) 862-9889

103 EISENHOWER PARKWAY
ROSELAND, NJ 07068
(973) 618-9100
FAX: (973) 364-9960

WILLIAM L. BREWER
(212) 826-5332
wbrewer@zeklaw.com

August 15, 2011

**BY CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

829 Realty LLC
P.O. Box 468
Parkville Station
Brooklyn, New York 11204
Attention: Pinchos D. Shemano and
David Shemano

Jacob Finkelstein
501 Avenue F
Brooklyn, New York 11218

Meir C. Gutfreund
1938 53rd Street
Brooklyn, New York 11204

Pinchos D. Shemano
2160 82nd Street
Brooklyn, New York 11214

**Loan in the original principal amount of $8,000,000 (the "Loan") evidenced by a Consolidated, Amended and Restated Promissory Note dated May 31, 2001 (the "Note") made by 829 Realty LLC ("Borrower") and secured by a Consolidated, Amended and Restated Mortgage and Security Agreement dated as of May 30, 2001 (the "Mortgage") encumbering the premises known by the address of 829 Greenwood Avenue, Brooklyn, New York, and guaranteed pursuant to the terms of that certain Guaranty of Recourse Obligations of Borrower executed by Jacob Finkelstein. Meir C. Gutfreund and Pinchos D. Shemano (collectively, the "Guarantors") dated May 31, 2001 (the "Guaranty")**

## NOTICE OF DEFAULT AND DEMAND FOR PAYMENT

Dear Borrower and Guarantors:

This firm has been retained to represent U.S. Bank National Association, as Trustee, as successor in interest to Bank of America National Association, as Trustee for the Registered Certificateholders of GMAC Commercial Mortgage Securities, Inc., Mortgage Pass-Through Certificates, Series 2001-C2 ("Trustee"), acting by and

ZEICHNER ELLMAN & KRAUSE LLP

829 Realty LLC
August 15, 2011
Page 2






through Berkadia Commercial Mortgage LLC ("**Berkadia**") in its capacity as Sub-Special Servicer for Trustee.

Trustee is the current holder of the Note, Mortgage, Guaranty and such other documents executed in connection with the Loan (collectively, the "**Loan Documents**"). Unless otherwise defined in this Notice of Default, all capitalized terms herein shall have the meanings ascribed to them in the Loan Documents.

On behalf of Trustee, we hereby notify you that Borrower is in default under the terms of the Loan Documents as a result of, among other things, Borrower's failure to pay the entire outstanding principal balance of the Loan, together with all accrued but unpaid interest thereon and all other amounts due under the Note, Mortgage or any other Loan Document on or before the Maturity Date (June 5, 2011).

Accordingly, on behalf of Trustee, we hereby demand immediate payment in full of the outstanding principal amount of $7,148,305.53, together with all accrued and unpaid interest thereon, including interest calculated at the Default Interest Rate, late charges, reasonable attorneys' fees and expenses, and additional costs, expenses and amounts due and payable under the Loan Documents through the date of payment (collectively, the "**Obligations**").

You may contact James B. Horan, Vice President of Berkadia, at 215-328-1940 to obtain the exact amount necessary to satisfy the Obligations as of the payment date.

Be advised that the license granted to Borrower to collect Rents and other sums due under the Lease Guaranties and Bankruptcy Claims in accordance with that certain Assignment of Leases and Rents dated May 30, 2001, is hereby revoked. Any Rents and other sums due under the Lease Guaranties and Bankruptcy Claims currently in your possession and that come into your possession hereafter shall be held by Borrower in trust for Trustee, and delivered to Trustee as set forth below.

On behalf of Trustee, we hereby demand that Borrower deliver to Trustee on or before August 26, 2011 all Rents and other sums due under the Lease Guaranties and Bankruptcy Claims generated by Leases at the Property, and all books and records relating to the Property, including, but not limited to, financial statements for the Property for calendar year 2011 through August 1, 2011 and a rent roll for the Property as of August 1, 2011. The foregoing should be sent to the attention of James B. Horan at the following

ZEICHNER ELLMAN & KRAUSE LLP

829 Realty LLC
August 15, 2011
Page 3

address: Berkadia Commercial Mortgage LLC, 116 Welsh Road, Horsham, Pennsylvania 19044.

Please be further advised that in the event Borrower and/or the Guarantors fail to deliver the Rents and other sums due under the Lease Guaranties and Bankruptcy Claims, books and records to Trustee as requested herein, Trustee shall seek to hold Borrower and the Guarantors personally liable for Losses incurred due to the failure to deliver the Rents and books and records in accordance with Sections 15.3(b) and 15.4(ii) of the Mortgage.

Unless the Obligations are paid within ten days of the date of this letter, Trustee will take appropriate legal steps to protect its rights. These steps may include, without limitation, the commencement of a mortgage foreclosure proceeding to recover the full amount of the Obligations due pursuant to the Loan Documents.

Payment to Trustee in an amount less than the total delinquent sums will not be construed as an accord and satisfaction or as Trustee's agreement to accept a lesser amount as payment in full of the Obligations. Trustee's acceptance of any endorsement or statement on a check evidencing a payment or letter accompanying a payment may not be deemed to be an accord and satisfaction. Trustee may accept any such payment or check without prejudice to its rights to receive the balance of all amounts due under the Loan Documents or to pursue any remedy thereunder or at law and equity.

This letter is written without prejudice to the rights and remedies of Trustee, all of which rights are specifically reserved. This letter is not intended to contain an exhaustive or complete listing of all defaults or Events of Default or Lender's remedies that currently may exist with respect to the Loan Documents.

Be guided accordingly.

Very truly yours,


William L. Brewer

WLB:dct

cc:    Mr. James B. Horan, V.P. (By E-Mail)
       Joel H. Rabine, Esq. (By First Class Mail)

**EXHIBIT B**

April 22, 2011

829 Realty, LLC                                                    144-51 Northern Boulevard
C/o Mr. Meir Gutfruend                                              Flushing, New York 11354
829 Greenwood Avenue
Brooklyn, NY  11218

                          Borrower:      829 Realty, LLC
                          Premises:      829 Greenwood Avenue
                                         Brooklyn, NY

THE FLUSHING SAVINGS BANK, herein called the "Bank", agrees with 829 Realty, LLC, herein called
"Borrower", to make a mortgage loan in accordance with the following terms and conditions.  The members
of the Borrower are Meir Gutfruend and Jacob Finkelstein.

SECURITY FOR MORTGAGE LOAN
The mortgage loan shall be secured by a mortgage which shall constitute a valid first lien on the fee simple
title to the real property, the appurtenances thereto and the improvements to the property described herein
("Real Property") and such other security as is hereinafter described.

THE REAL PROPERTY

Location:       829 Greenwood Avenue, Brooklyn, NY

                Block # : 5279        Lot # : 43
                Building Dimension    : 5279 est. square feet
                Lot Dimension         : 43 est. square feet

GENERAL DESCRIPTION OF IMPROVEMENTS:
First mortgage on a 8 story, elevator, apartment building with a total of 135 apartments and a parking lot with
80 spaces.

USE OF PROCEEDS:
This is a refinance transaction.

TERMS AND RATES OF PROPOSED MORTGAGE LOAN

Amount                  :       $7,400,000

Interest Rate           :       4.75%

Term                    :       14 Years (168 months)

Amortization Period     :       30 Years (360 months)

Repayments              :       P & I Monthly: $38,601.90

Commitment Fee:                 $74,000 (1.00%) - in the event that the loan closing occurs, on or
                                before June 22, 2011, in accordance with the terms and conditions
                                herein, the Bank will refund the commitment fee at the time of the
                                loan closing.

**FLUSHING Bank**
Commercial ▪ Business ▪ Consumer

## INTEREST RATE ADJUSTMENT
The interest rate during the first seven years (Initial Term) shall be 4.75% per annum. The Initial Term shall expire on the seventh anniversary of the first day of the month immediately following the closing of the loan. The interest rate during years eight through fourteen (Second Term) shall be two hundred twenty five basis points (2.25%) over the Bank's cost of borrowing for a seven (7) year term from the Federal Home Loan Bank of New York as of sixty (60) days prior to the expiration of the Initial Term. The Second Term shall expire on the fourteenth anniversary of the first day of the month immediately following the closing of the loan. If the Federal Home Loan Bank of New York line of borrowing is not available, the Bank will choose a similar index for the interest rate calculation. In no event shall the interest rate during the Second Term be less than that during the Initial Term.

## LATE PAYMENTS
Borrower shall pay a charge of eight (8) cents for each dollar ($1.00) of each aggregate monthly payment if not made within fifteen (15) days after the due date to cover the extra expenses involved in handling late payments.

## SUBORDINATION OF LEASES
Copies of all existing leases, whose terms and conditions must be in form and substance satisfactory to the Bank, are to be submitted to the Bank prior to closing the loan. In the event that a lease submitted does not contain a clause which subordinates that lease to the proposed lien of the first mortgage to be held by the Bank, then and in that event, there must be submitted by the Tenant, a Subordination Agreement, which in fact does subordinate the lease to the proposed lien of the first mortgage to be held by the Bank.

## SECURITY DEPOSITS
The security deposit for all Leases, as of the date of closing, shall be deposited with the Bank. After closing, further security deposits shall be made when new tenants enter the premises. Withdrawals will be authorized as tenants leave the premises.

## ASSIGNMENT OF LEASES
In addition, an Assignment of Leases will be executed by the Borrower at closing, which form will provide that the Bank, at its option, can collect rents pursuant to the terms of the leases in the event there is a default in repayment of the loan. Enclosed is Schedule A, which should be completed for each commercial Tenant which will be attached to the Assignment of Lessor's Interest in the Lease. This form should be completed by the Borrower and brought by the Borrower to the closing.

## ESTOPPEL CERTIFICATION
The Owner shall obtain, from all non-residential Tenants, an Estoppel Certification indicating that at the time of the execution of the Certification, the Lease to be assigned to the Bank is in full force and effect; that there are no modifications which are not attached to the Lease; stating the commencement date and termination date of the Lease; stating that the rent is current; stating that the security, if any, referred to in the Lease has in fact been deposited with the Owner; and that the Tenant has been advised as to the Bank and account number where the security has been deposited; set forth whether or not there has been any offset against rental or whether or not advance rental has been paid to the Owner; and stating whether or not there exists any default by the Owner under the terms of the Leasing Agreement; and in accordance with the terms of the Leasing Agreement, has the Tenants filed for Bankruptcy, or Assignment or any other arrangements for the benefit of creditors under any Federal or State Statute. Enclosed is an Estoppel Certification which the Borrower should obtain, before closing, from each of the commercial Tenants. This form should be brought to the closing.

## SECONDARY FINANCING
There will be a Flushing Bank, Secondary Mortgage, Line of Credit. No other financing will be permitted.

PREPAYMENT PRIVILEGE

The privilege will be granted to prepay the entire principal balance upon payment of a premium equal to the following: five (5%) percent of the outstanding principal during the first, second, eighth and ninth years of the loan; four (4%) percent of the outstanding principal during the third, fourth, tenth and eleventh years of the loan; three (3%) percent of the outstanding principal during the fifth and twelfth years of the loan; two (2%) percent of the outstanding principal during the sixth and thirteenth years of the loan; one (1%) percent of the outstanding principal during the seventh and fourteenth years of the loan. Prepayment may be made on any interest date upon sixty (60) days prior written notice to the Bank, provided all interest, late charges and prepayment premiums are also paid to the Bank at the time of prepayment.

**AUTOMATIC LOAN PAYMENT OPTION**

**The Bank currently offers its borrower the option of making monthly payments electronically. Each month, the Bank can arrange to have your regularly scheduled loan payment automatically deducted from your account. You may establish a checking account with Flushing Savings Bank, FSB or you may choose to have your payment deducted from your existing checking account, even if your account is not with Flushing Savings Bank, FSB.**

**To participate in our Automatic Payment Program, kindly complete the enclosed form and attach a voided blank check.**

CASUALTY INSURANCE

The Bank shall be furnished at least seven (7) days prior to the Closing Date with a fire and casualty insurance policy for the Premises having a term of at least one year, which policy shall be sufficient for the insurer to provide 100% replacement coverage with fire, extended coverage, vandalism and malicious mischief insurance coverage and such other extended coverage as may be reasonably required by the Bank in an amount to be determined by the Bank and the appraiser designated by the Bank (with an "Agreed Amount" endorsement). The policy shall name the Bank and its successors and/or assigns (with a mailing address of c/o Flushing Savings Bank, FSB First Mortgage c/o Dovenmuele Inc., 1 Corporate Drive, Lake Zurich, IL 60047 as first mortgagee pursuant to a standard New York mortgagee clause as well as additional insured and shall be renewable thereafter for one-year terms. The insurance is subject to approval by Bank and its counsel as to companies, amounts, forms and expiration dates. The actual casualty policy and receipted bill for one year's premium on each shall be presented on the Closing Date. A BINDER WILL BE UNACCEPTABLE.

FLOOD INSURANCE

If the premises are located in a designated flood area, you will be required to obtain and maintain flood insurance. You will be required to prepay one year's premium for flood insurance and have a paid policy or certificate of insurance relating to the flood insurance available at the closing, which must name the Bank as First Mortgagee. At the Bank's option, monthly escrow payments of one-twelfth (1/12th) of the annual flood insurance premium will be collected by the Bank with your monthly loan payment. The cost of the flood hazard search, $25, is to be paid by the Borrower.

TRANSFER OF TITLE

The Loan Documents will provide that the entire principal sum together with interest accrued thereon shall be due and payable at the option of the Bank in the event of the sale, transfer, conveyance, or encumbrance of the Premises without the prior written consent of the Bank, including but not limited to, the following transactions: conveyance or sale of the ownership of the Premises to any other form of legal or equitable ownership, or the further mortgaging of the Premises, or the insolvency or death of the Borrower or any Guarantor, or any other transaction that constructively transfers the beneficial ownership of the Borrower or the Premises.

## ACCOUNTING RECORDS

Borrower shall maintain proper records and accounts showing income and expense in the operation of the mortgaged premises and within ninety (90) days after the close of each fiscal year, Borrower shall submit profit and loss statements for the previous fiscal year. Statements shall be prepared by an independent Certified Public Accountant or by the financial officers of Borrower satisfactory to the Bank and shall be prepared in accordance with generally accepted accounting principles.

If the Borrower does not submit the annual operating statements for the property, as described in the preceding paragraph, the Bank shall have the option to increase the interest rate on the mortgage by 1% per annum.

In the event that for two consecutive years, the fiscal profit and loss statements reflects a net income less than the payment to mortgagee for the respective fiscal periods, then the mortgagee, at its option, shall have the right and privilege to call the indebtedness secured by the mortgage and interest accrued thereon.

Financial statements of lessees and guarantors, if any, will also be required, and if so, will be subject to the stipulation in the preceding paragraph.

## INSPECTION OF PREMISES

Bank or its agents may make annual or other periodic inspections of the premises.

## ANNUAL INSPECTION FEE

There will be an annual property inspection fee of $300 payable by the Borrower.

## ASBESTOS AND HAZARDOUS WASTE

The loan documents will contain provisions imposing the obligation of continuing compliance with all Federal, State and Local laws, ordinances, rules and regulations regarding asbestos and hazardous and toxic materials.

Prior to loan closing, a Phase I Environmental Audit of the proposed collateral will be required in form and substance satisfactory to the Bank. The cost, **$2,500** (estimated) will be borne by the Borrower and is **due and payable upon acceptance of this Commitment.** All re-inspection fees will be the responsibility of the Borrower.

## ESCROW REQUIRED

Bank will escrow for one-twelfth (1/12th) of the annual Real Estate taxes water/sewer charges and insurance, and any special assessments or charges. At closing, a deposit to the escrow account will be required, sufficient to allow the Bank to pay the charges when they become due.

## APPRAISAL FEE

The Bank's obligation to make the mortgage loan is conditioned upon receipt by the Bank of a satisfactory appraisal from an appraiser acceptable to the Bank. Bank's appraisal fees totaling **$4,500** (estimated) shall be borne by the Borrower **payable upon acceptance of this commitment.** The fee is non-refundable under any circumstances.

## DOCUMENTS AND INSTRUMENTS FOR CLOSING

Bank's Counsel shall prepare all documents and instruments that will contain all terms and conditions including affirmative and negative covenants deemed appropriate by the Bank and its Counsel, and approve, as submitted by Borrower, Certificates and Report of Title, free of any and all violations, which shall include a tax search, Tax Map description, Departmental Searches, Certificate of Occupancy, Street Report upon which a policy of Title Insurance will be issued insuring the Bank as First Mortgagee, together with a satisfactory survey guaranteed to said Title Company and to Bank. Any survey over one year old must be

updated by inspection and if any structural changes have been made to the exterior of the premises since the date of the survey, a new survey will be required. Survey submitted may not be in excess of 20 years in age.

There shall be filed, both with the County Clerk where the mortgaged premises are located and with the Secretary of State, Albany, New York, a UCC-1 Financing Statement setting forth the Bank as the secured party, covering all non-fixtures owned by the mortgagor and used in the operation of the mortgaged premises, rents, profits and unearned insurance premiums.

## LOAN DOCUMENTS

The Borrower and the Guarantors shall indemnify the Bank against all environmental conditions now or hereafter existing at the Premises pursuant to an environmental indemnity agreement between the Borrower, the Guarantors and the Bank ( the "Indemnity Agreement"). The Mortgage Note, Mortgage, Assignment of Rents and Leases, Guarantee [Limited Guarantee], Indemnity Agreement and all other documents required in connection with the Mortgage Loan (the "Loan Documents") will be prepared and reviewed by counsel to the Bank and will be in form and content acceptable to the Bank and its counsel.

## GUARANTORS:

The Bank will require Meir Gutfreund and Jacob Finkelstein (collectively, the "Guarantors") to execute and deliver a limited guarantee (the "Limited Guarantee") which shall provide that the Guarantors shall, jointly and severally, indemnify the Bank for any costs or expenses resulting to the Bank (i) for fraud or intentional misrepresentation of the Borrower or any of the Guarantors, (ii) the gross negligence or willful misconduct by Borrower; (iii) the physical waste of the Premises; (iv) the breach of any representations, warranties, covenants or indemnification provisions in the Mortgage concerning environmental laws, hazardous substances or asbestos; (v) the removal or disposal of any portion of the Premises after an Event of Default; (vi) the misapplication or conversion by Borrower of any insurance proceeds, condemnation awards, rents, income or other revenue from the Premises, (vii) the failure to pay charges for labor or materials or other charges that can create liens on any portion of the Premises; (viii) any security deposits collected with respect to the Premises which are not delivered to Bank upon a foreclosure of the Premises or action in lieu thereof, except to the extent any such security deposits were applied in accordance with terms and conditions of the space leases for the Premises prior to the occurrence of the event of default giving rise to such foreclosure or action in lieu thereof; (ix) all real estate taxes, water and sewer charges and assessments (including all interest and penalties as a result of non-payment or otherwise) that may now or hereafter be owing in respect of the Premises; (x) for abandonment of the Premises, (xi) due to the transfer of the Premises in violation of the Loan Documents, (xii) from the failure to permit inspections of the Premises, or (xiii) resulting from the seizure or forfeiture of the Premises, or any portion thereof, or Guarantors' interest therein, resulting from any criminal wrongdoing or other unlawful actions of Borrower or its affiliates under any federal, state or local law.

## OPINION OF COUNSEL

The Bank shall require a favorable opinion of counsel to the Borrower and the Guarantors as to the transactions contemplated hereby and as to (i) the Borrower's legal existence and good standing; (ii) the enforceability of the Loan Documents in accordance with their respective terms (except as enforceability may be limited by bankruptcy or similar laws effecting the rights of creditors and except for the enforceability of self-help and other equitable remedies); and (iii) action required to be taken or performed by the Borrower and the Guarantors to consummate the transactions contemplated by this Commitment having been duly and effectively taken and as to other matters as the Bank or its counsel may request, all in form and substance satisfactory to counsel to the Bank.

## BORROWER'S DOCUMENTS

The Borrower shall be required to provide the Bank with: (i) if the Borrower is a corporation, (1) a copy of such entity's certificate of incorporation and all amendments thereto together with the filing receipts therefore, (2) a certificate of good standing certified no earlier than ten (10) days prior to Closing Date by the Secretary of State of the state of such entity's corporation, (3) a certified copy of the by-laws of such entity,

(4) a copy of the resolutions adopted by the Board of Directors or shareholders of such entity (as the Bank may require) authorizing the actions to be taken by such entity in connection with the Mortgage Loan, and (5) an incumbency certificate from such entity and other evidence satisfactory to the Lender as to the authority of the individual signing the Loan Documents on behalf of such entity; (ii) if the Borrower is a partnership, (1) a certified copy of such entity's partnership agreement, (2) a copy of such entity's Certificate of Limited Partnership or Business Certificate for Partners (as the case may be) certified by the Secretary of State or the clerk of the County of such entity's formation (as the case may be), (3) a consent of all of the partners of such entity authorizing the actions to be taken by such entity in connection with the Mortgage Loan and authorizing one of the partners to execute all documents in connection therewith; and (4) a certificate of good standing certified no earlier than ten (10) days prior to Closing Date by the Secretary of State of the state of such entity's formation (in the case of a limited partnership) and (iii) if the Borrower is a limited liability company, (1) a certified copy of such entity's operating agreement, (2) a certified copy of such entity's Articles of Organization and Certificate of Conversion (if applicable), (3) a certificate of good standing certified no earlier than ten (10) days prior to the Closing Date by the Secretary of State of such entity's formation, and (4) a consent of all of the members of such entity authorizing the actions to be taken by such entity in connection with the Mortgage Loan and authorizing one of the members to execute all documents in connection therewith.

CERTIFICATE OF OCCUPANCY
The Bank shall be furnished prior to the Closing Date with a copy of the certificate of occupancy for the improvements at the Premises and all other property certificates from all governmental authorities having or claiming to have jurisdiction over the Premises.

APPLICATION FEE: $1,000, due and payable upon submission of a written loan application.

CLOSING FEES
The cost and expenses of said title insurance policy, recording fees, and all other expenses regarding the mortgage loan, including Bank's Attorney Fee of $8,000, and a credit report fees of $100 shall be borne and payable by the Borrower at closing.

The Bank's legal fee excludes disbursements which shall also be payable by the Borrower. The Bank's legal fee will increase in an amount to be determined by the Bank or Bank counsel, in its or their sole and absolute discretion, upon the occurrence of discussions, with the Borrower or its representatives regarding the mortgage loan, in excess of that reasonably contemplated by the Bank or Bank counsel or the existence of circumstances related to the mortgage loan, including, but not limited to, environmental or title problems, not reasonably contemplated by the Bank or Bank counsel. In such event, the Borrower will be billed at the firm's standard billing rates.

REQUEST FOR ASSIGNMENT OF MORTGAGES
In the event that the applicant would like to request the Bank to accept any existing mortgages by assignment, then in that event the applicant should arrange, within ten (10) days of acceptance of this Commitment, to have the existing lender forward to the Bank's attorney all of the following documentation:

a.    The front and back pages of all recorded documents as the same will appear in your title search;

b.    A copy of all notes or bonds;

c.    A copy of the proposed Assignment which Assignment must provide for Section 275 of the Real Property Law.

Upon satisfactory review of all documentation requested, the Bank's attorney will notify the Borrower's attorney. It is the Borrower's responsibility to arrange for a representative of the existing Lending Institution (the "Assignor") to be present at the loan closing. This designated representative must present all of the original loan documentation, including an original Executed Assignment, satisfactory for recording, to Flushing Savings Bank, FSB, at the time of closing. Lastly, upon scheduling a closing date, the applicant must arrange to have a payoff letter delivered or faxed to the Bank's attorney. Facsimile: (718) 461-5651. An additional charge of $750 will be assessed for the review and consolidation of up to three (3) existing mortgage loans. If more than three (3) loans are assigned and consolidated, an additional $250 will be assessed.

Please note that the Bank will only accept an assignment from another Institutional Lender.

INTEREST AT CLOSING
Interest from date of closing to end of month will be collected by the Bank at closing.

PLACE OF CLOSING
Closing will take place at the offices of Nicolosi & Nicolosi ; contact John Donohue at (516) 869-6900.

EXPIRATION OF COMMITMENT
In the event that the loan is not closed by **June 22, 2011** the Bank, from the date hereof at its option, may declare this loan Commitment null and void.

ACCEPTANCE OF COMMITMENT
For this Commitment to be effective, acceptance of this Commitment must be made within ten (10) days of the date hereof by Borrower signing and returning the enclosed copy of this letter, along with non-refundable commitment fee of **$75,000.** To date the Bank has received **$37,000.** The balance due the Bank is **$38,000.**

CREDIT STATUS
This Commitment is conditioned upon verification of your credit status, as disclosed in the loan application or by subsequent credit information supplied to you, and the Bank shall have the option of canceling this Commitment if there is or reasonably appears to be a material change in your credit status at the time that the loan is scheduled to close.

MATERIAL CHANGE
No statements, agreements or representations, oral or written which may have been made either by the Bank or by any employee, agent or broker, with respect to this Commitment or the Mortgage Loan shall be of any force or effect, except to the extent stated in this Commitment, and all prior agreements and representations in respect of this Commitment and the Mortgage Loan are merged herein so that this Commitment shall contain the entire agreement with respect to the Mortgage Loan. This Commitment may not be (i) changed except by written agreement signed by the Borrower and the Bank, or (ii) assigned or otherwise transferred by the Borrower, by agreement, operation of law, or otherwise, unless the Bank shall consent in writing to such assignment.

The Bank may terminate this Commitment at its sole option on giving written notice to the effect that such action has been taken if, (i) the contemplated transaction is or has been misrepresented by the Borrower or any of the Guarantors in the information previously delivered by the Borrower or any of the Guarantors to the Bank or otherwise; (ii) any material adverse change shall occur with respect to the Borrower, any of the Guarantors or any security for or other source of repayment of the Mortgage Loan at any time prior to the Closing Date; (iii) the Borrower or any of the Guarantors shall be involved in any arrangement, bankruptcy, reorganization or insolvency proceeding or (iv) if any of the conditions precedent specified in this Commitment are not fulfilled as and when required.

829 Greenwood Ave, Brooklyn, NY
                                                 April 22, 2011

It is specifically understood and agreed that, at the option of the Bank, time is of the essence as to any and all dates specified in this Commitment. Whenever a certain length of time is fixed for the performance of any and additional time is allowed, the new time fixed by such exception shall also be of the essence without further specific provision.

This Commitment is being delivered and is to be performed in the Sate of New York and shall be construed and enforced in accordance with and governed by the laws of the State of New York.

The Commitment shall not be binding on the Bank unless it is properly signed and accepted in the form submitted and returned to the Bank no later than the close of business on **May 9, 2011**; and by such date the Borrower pays the Bank's Commitment Fee.

SPECIAL CONDITIONS
This Commitment is subject to the performance and satisfactory completion of all special conditions as outlined in Exhibit A attached and titled "SPECIAL CONDITIONS - PRIOR TO THE LOAN CLOSING."

Sincerely,

Denis Mangan
Vice President
Lending Officer

Ronald M. Hartmann
Senior Vice President
Lending Officer

ACCEPTED AND APPROVED BY:            Kindly print your attorney's name, address, and telephone number below:

_____            Name: _____

_____            Address: _____

_____            _____

Dated: _____      Telephone: (     ) _____

9                                   829 Greenwood Ave, Brooklyn, NY
                                    April 22, 2011

# EXHIBIT A

## SPECIAL CONDITIONS - PRIOR TO THE LOAN CLOSING

1.    Satisfactory appraisal report of the proposed collateral property indicating, in the Bank's sole judgment, a current fair market value of not less than $18,900,000, and a satisfactory annual net operating income, net appropriate reserves, of not less that 1.30% of the required annual debt service.

2     Subject to satisfactory review and inspection of the proposed property by Two (2) members of the Board of Directors Inspection Committee.

3.    Subject to a satisfactory credit investigation of the proposed Borrower and its principals with a 10% or more ownership interest.

4.    Subject to receipt of a satisfactory Environmental Report.

5.    The loan documents shall include the Bank's standard exculpatory language.

6.    Subject to receipt and satisfactory review of Operating Histories for the previous 2 years and current Operating Budget.

7.    Subject to receipt of personal financial statements and supporting documentation on all principals with a 10% or more ownership interest.

8.    Subject to receipt of a historical DHCR Certified Rent Roll printout.

9.    Subject to receipt of the copies of the Prompt Parking master lease and Clearwire Legacy, LLC. antenna lease.

10.   Borrower is to open a lease security account at the Bank with a minimum balance of $196,000.

11.   Borrower is to open a remote capture, operating account for the subject property as a main depository relationship with Flushing Savings Bank. This account is to be maintained at the Bank for the life of the loan with online banking and automatic mortgage payment.

Initialed _____

FILED: KINGS COUNTY CLERK 08/31/2011
INDEX NO. 500665/2011
NYSCEF DOC. NO. 2-6
RECEIVED NYSCEF: 08/31/2011

**EXHIBIT C**

## NYC DEPARTMENT OF FINANCE
## OFFICE OF THE CITY REGISTER

This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument. The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.



2011052500608001001E326D

| RECORDING AND ENDORSEMENT COVER PAGE | | PAGE 1 OF 6 |
|---|---|---|

Document ID: 2011052500608001     Document Date: 05-23-2011     Preparation Date: 05-25-2011
Document Type: CERTIFICATE
Document Page Count: 4

**PRESENTER:**
829 REALTY LLC
1938 53RD STREET
BROOKLYN, NY 11204

**RETURN TO:**
PD FAMILY CREDIT SHELTER TRUST
1938 53RD STREET
BROOKLYN, NY 11204

### PROPERTY DATA

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| BROOKLYN | 5279 | 43 | Entire Lot | 135 | 829 GREENWOOD AVENUE |

Property Type: COMMERCIAL REAL ESTATE

### CROSS REFERENCE DATA

CRFN_____  or  Document ID_____  or  _____  Year_____  Reel ___  Page _____  or  File Number_____

### PARTIES

**PARTY 1:**
MEIR GUTFREUND
1938 53RD STREET
BROOKLYN, NY 11204

**PARTY 2:**
829 REALTY LLC
1938 53RD STREET
BROOKLYN, NY 11204

x  Additional Parties Listed on Continuation Page

### FEES AND TAXES

| Mortgage | | | Filing Fee: | | |
|---|---|---|---|---|---|
| Mortgage Amount: | $ | 0.00 | | $ | 0.00 |
| Taxable Mortgage Amount: | $ | 0.00 | NYC Real Property Transfer Tax: | | |
| Exemption: | | | | $ | 0.00 |
| TAXES: County (Basic): | $ | 0.00 | NYS Real Estate Transfer Tax: | | |
| City (Additional): | $ | 0.00 | | $ | 0.00 |
| Spec (Additional): | $ | 0.00 | | | |
| TASF: | $ | 0.00 | | | |
| MTA: | $ | 0.00 | | | |
| NYCTA: | $ | 0.00 | | | |
| Additional MRT: | $ | 0.00 | | | |
| TOTAL: | $ | 0.00 | | | |
| Recording Fee: | $ | 57.00 | | | |
| Affidavit Fee: | $ | 0.00 | | | |

**RECORDED OR FILED IN THE OFFICE OF THE CITY REGISTER OF THE CITY OF NEW YORK**
Recorded/Filed     05-27-2011 14:37
City Register File No.(CRFN):
**2011000191254**

*Annett M Sill*

**City Register Official Signature**

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**



2011052500608001001C30ED

| RECORDING AND ENDORSEMENT COVER PAGE (CONTINUATION) | | PAGE 2 OF 6 |
|---|---|---|
| **Document ID:** 2011052500608001 | Document Date: 05-23-2011 | Preparation Date: 05-25-2011 |
| Document Type: CERTIFICATE | | |

**PARTIES**
**PARTY 1:**
PD FAMILY CREDIT SHELTER TRUST
C/O MEIR GUTFREUND, 1938 53RD STREET
BROOKLYN, NY 11204

# CERTIFICATE
OF DECLARATION

The following declaration has been made and executed this 23rd day of May, 2011.

## 829 REALTY LLC WITH OFFICES AT 1938 53RD STREET, BROOKLYN, NY 11204

PLEASE TAKE NOTICE that Meir Gutfreund, as trustee of PD Family Credit Shelter Trust, with offices located at c/o Meir Gutfreund, 1938 53rd Street, Brooklyn, New York 11204, as 33% member of 829 Realty LLC, with offices located at 1938 53rd Street, Brooklyn, New York 11204, hereby declares that PD Family Credit Trust, as 33% member of 829 Realty LLC, objects to the execution by 829 Realty LLC of any sale, exchange, lease, mortgage, pledge of its property located at 829 Greenwood Avenue, Brooklyn, New York Block 5279, Lot 43, or relating thereto. 829 Realty LLC's operating agreement at § 5.1.3.5 and in other places prohibits any such transaction without membership approval. Any deed or mortgage or other document in any way affecting the real property known as 829 Greenwood Avenue, Brooklyn, New York or title thereto unless accompanied by a fully acknowledged consent by PD Family Credit Trust is invalid. Meir Gutfreund is the only individual authorized to execute this document, and any document not executed and acknowledged by Meir Gutfreund is invalid. Any sale, mortgage or other encumbrance or any other action taken by 829 Realty LLC without the consent of Meir Gutfreund, as trustee of PD Family Credit Shelter Trust, is unauthorized and is therefore null, void and of no effect, including, but not limited to, the property described in the attached Schedule A, unless the deed, mortgage or any other document in any way affecting the real property, or title thereto, is executed by Meir Gutfreund, the individual whose authorization is necessary for the

corporation to act in connection with a sale, conveyance, mortgaging or placing of

encumbrance upon any of its properties or any other action affecting the real property in

any way. Any sale, conveyance, mortgage or other encumbrance or any other action

taken by the corporation without the express written authorization of Meir Gutfreund,

unless any such document is executed by Meir Gutfreund, is unauthorized and is

therefore null, void and of no effect.

829 Realty LLC

By: _____

Meir Gutfreund
As Trustee for
PD Family Credit Trust
As Member of 829 Realty LLC

**STATE OF NEW YORK** )
                ) ss.:
**COUNTY OF KINGS** )

On the 23rd day of May, in the year 2011, before me, the undersigned, a Notary Public in
and for said State, personally appeared Meir Gutfreund, personally known to me or
proved to me on the basis of satisfactory evidence to be the individuals(s) whose name(s)
is (are) subscribed to the within instrument and acknowledged to me that he/she/they
executed the same in his/her/their capacity(ies) and that by his/her/their signature(s) on
the instrument, the individual(s) or the person upon behalf of which the individual(s)
acted, executed the instrument.

_____

NOTARY PUBLIC

ISRAEL VIDER
Notary Public, State of New York
No. 02VI-4967060 Qual. in Kings County
Commission Expires May 21, 20⟨4



REEL 5 8 4 PAGE 1 5 0 9
5842PG1509

## SCHEDULE A 

Amended 05-16-2001

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the County of Kings, City and State of New York is more particularly bounded and described as follows:

BEGINNING at the corner formed by the intersection of the Northerly side of Greenwood Avenue with the Westerly side of Prospect Park South West (Coney Island Road or Avenue);

RUNNING THENCE Northerly along the Westerly side of Prospect Park South West, 203 feet 11 inches;

RUNNING THENCE Westerly at right angles to Prospect Park South West 149 feet 11 inches;

THENCE Westerly at right angles to Sherman Street, 147 feet 2 1/2 inches to the Easterly side of Sherman Street;

THENCE Southerly along the Easterly side of Sherman, 100 feet;

THENCE Easterly at right angles to Sherman Street, 90 feet;

THENCE Southerly parallel with Sherman Street, 25 feet;

THENCE Easterly at right angles to Sherman Street 16 feet 2 3/4 inches;

THENCE Southerly parallel with Sherman Street, 16 feet 1/2 inches;

THENCE Southeasterly at right angles to Greenwood Avenue 115 feet to the Northerly side of Greenwood Avenue;

THENCE Easterly along the Northerly side of Greenwood Avenue, 177 feet 10 1/2 inches to the point or place of BEGINNING.

**FOR CONVEYANCING ONLY**

The policy to be issued under this report will insure the title to such buildings and improvements erected on the premises which by law constitute real property.

TOGETHER with all the right, title and interest of the party of the first part, of, in and to the land lying in the street in front of and adjoining said premises.

MADISON ABSTRACT, INC.                     Title No: K 00 5614

829 GREENWOOD AVENUE
BROOKLYN, NY
BLOCK 5279, LOT 43

**CERTIFICATE**

OF DECLARATION

Recorded at the request of:
**829 REALTY LLC**
**1938 53rd Street**
**BROOKLYN, NEW YORK 11204**

Record and Return to:
**PD FAMILY CREDIT SHELTER TRUST**
**1938 53rd Street**
**BROOKLYN, NEW YORK 11204**

FILED: KINGS COUNTY CLERK 08/31/2011

NYSCEF DOC. NO. 2-7

INDEX NO. 500665/2011

RECEIVED NYSCEF: 08/31/2011

# EXHIBIT D

Manager Managed

Operating Agreement

<u>829 Realty LLC</u>

As of August 23, 2000

Prepared By:

**RABINE & NICKELSBERG**
**ATTORNEYS-AT-LAW**
**993 Morris Park Avenue**
**Bronx, N.Y. 10462**

# TABLE OF CONTENTS

EXPLANATORY STATEMENT . . . . . . . . . . . . . . . . . . . . 1

ARTICLE 1 – Defined Terms . . . . . . . . . . . . . . . . . . 1

ARTICLE 2 – Formation and Name: Office, Purpose, Term . . . . . 7

ARTICLE 3 – Members; Capital; Capital Accounts . . . . . . . 8

ARTICLE 4 – Profit, Loss, and Distributions . . . . . . . . . . 9

ARTICLE 5 – Management: Rights, Powers, and Duties . . . . . 15

ARTICLE 6 – Transfer of Interests and Withdrawal of Members . 21

ARTICLE 7 – Dissolution, Liquidation, and Termination of the

Company . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

ARTICLE 8 – Books, Records, Accounting, and Tax Elections . . 23

ARTICLE 9 – General Provisions . . . . . . . . . . . . . . . 25

ARTICLE 10 – Special Purpose Entity . . . . . . . . . . . . . 27

EXHIBIT A – List of Members, Capital, and Percentages . . . . 33

## Manager Managed
## Operating Agreement
## 829 Realty LLC

This Operating Agreement (this "Agreement") is entered into as of this 23rd day of August 2000 by and among FSG Realty Associates, LLC, as Manager and the Members who are the signatories hereto.

### EXPLANATORY STATEMENT

The parties have agreed to organize and operate a limited liability company in accordance with the terms and subject to the conditions set forth in this Agreement.

NOW, THEREFORE, for good and valuable consideration, the parties, intending legally to be bound, agree as follows:

## Article 1
## Defined Terms

The following capitalized terms shall have the meaning specified in this Article 1.  Other terms are defined in the text of this Agreement and, throughout this Agreement, those terms shall have the meanings respectively ascribed to them.

1.1  "Adjusted Capital Account Deficit" means, with respect to any Economic Interest Holder, the deficit balance, if any, in the Economic Interest Holder's Capital Account as of the end of the relevant taxable year, after giving effect to the following adjustments:

1.1.1  the deficit shall be decreased by the amounts which the Economic Interest Holder is obligated to restore pursuant to Regulation Section 1.704-1(b)(2)(ii)(c); and

1.1.2  the deficit shall be increased by the items described in Regulation Sections 1.704-1(b)(2)(ii)-(d)(4), (5), and (6).

1.2  "Adjusted Capital Balance" means, as of any day, an Economic Interest Holder's total Capital Contributions less all amounts actually distributed to the Economic Interest Holder pursuant to Sections 4.2.3.4.1 and 4.4 hereof.  If an, Economic Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Adjusted Capital

Balance of the transferor to the extent the Adjusted Capital
Balance relates to the Economic Interest transferred.

1.3  "Affiliate" means, with respect to any Member, any
Person: (i) which owns more than 50% of the voting interests in
the Member; or (ii) in which the Member owns more than 50% of the
voting interests; or (iii) in which more than 50% of the voting
interests are owned by a Person who has a relationship with the
Member described in clause (i) or (ii) above or who otherwise
controls, is controlled by, or under common control with, another
person.

1.4  "Agreement" means this Operating Agreement, as amended
from time to time.

1.5  "Capital Account" means the account to be maintained by
the Company for each Economic Interest Holder in accordance with
the following provisions:

1.5.1  an Economic Interest Holders Capital Account
shall be credited with the Economic Interest Holder's Capital
Contributions, the amount of any Company liabilities assumed by
the Economic Interest Holder (or which are secured by Company
property distributed to the Economic Interest Holder), the
Economic Interest Holder's distributive share of Profit and any
item in the nature of income or gain specially allocated to the
Economic Interest Holder pursuant to the provisions of Article 4
(other than Section 4.3.3); and

1.5.2  an Economic Interest Holder's Capital Account
shall be debited with the amount of money and the fair market
value of any Company property distributed to the Economic
Interest Holder, the amount of any liabilities of the Economic
Interest Holder assumed by the Company (or which are secured by
property contributed by the Economic Interest Holder to the
Company), the Economic Interest Holder's distributive share of
loss and any item in the nature of expenses or losses specially
allocated to the Economic Interest Holder pursuant to the
provisions of Article 4 (other than Section 4.3.3).

If any Economic Interest is transferred pursuant to the
terms of this Agreement, the transferee shall succeed to the
Capital Account of the transferor to the extent the Capital
Account is attributable to the transferred Economic Interest.  If
the book value of Company property is adjusted pursuant to
Section 4.3.3, the Capital Account of each Economic Interest
Holder shall be adjusted to reflect the aggregate adjustment in
the same manner as if the Company had recognized gain or loss

equal to the amount of such aggregate adjustment. It is intended that the Capital Accounts of all Economic Interest Holders shall be maintained in compliance with the provisions of Regulation Section 1.704-1(b), and all provisions of this Agreement relating to the maintenance of Capital Accounts shall be interpreted and applied in a manner consistent with that Regulation.

1.6  "Capital Contribution" means the total amount of cash and the fair market value of any other assets contributed (or deemed contributed under Regulation Section 1.704-1(b)(2)(iv)(d)) to the Company by a Member, net of liabilities assumed or to which the assets are subject.

1.7  "Capital Proceeds" means the gross receipts received by the Company from a Capital Transaction.

1.8  "Capital Transaction" means any transaction not in the ordinary course of business which results in the Company's receipt of cash or other consideration other than Capital Contributions, including, without limitation, proceeds of sales or exchanges or other dispositions of property not in the ordinary course of business, financings, refinancings, condemnations, recoveries of damage awards, and insurance proceeds.

1.9  "Cash Flow" means all cash funds derived from operations of the Company (including interest received on reserves), without reduction for any non-cash charges, but less cash funds used to pay current operating expenses and to pay or establish reasonable reserves for future expenses, debt payments, capital improvements, and replacements as determined by the General Manager. Cash Flow shall not include Capital Proceeds but shall be increased by the reduction of any reserve previously established.

1.10  "Code" means the Internal Revenue Code of 1986, as amended, or any corresponding provision of any succeeding law.

1.11  "Company" means the limited liability company formed in accordance with this Agreement.

1.12  "Economic Interest" means a Person's share of the Profits and Losses of, and the right to receive distributions from, the Company.

1.13  "Economic Interest Holder" means any Person who holds an Interest, whether as a Member or an unadmitted assignee of a Member.

1.14   "Manager" means the entity designated as such in Article 5.

1.15   "Involuntary Withdrawal" means, with respect to any Member, the occurrence of any of the following events:

1.15.1   the Member makes an assignment for the benefit of creditors;

1.15.2   the Member files a voluntary petition of bankruptcy;

1.15.3   the Member is adjudged bankrupt or insolvent or there is entered against the Member an order for relief in any bankruptcy or insolvency proceeding;

1.15.4   the Member files a petition seeking for the Member any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation;

1.15.5   the Member seeks, consents to, or acquiesces in the appointment of a trustee for, receiver for, or liquidation of the Member or of all or any substantial part of the Member's properties;

1.15.6   the Member files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in any proceeding described in Subsections 1.15.1 through 1.15.5;

1.15.7   any proceeding against the Member seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation, continues for one hundred twenty (120) days after the commencement thereof, or the appointment of a trustee, receiver, or liquidator for the Member or all or any substantial part of the Member's properties without the Member's agreement or acquiescence, which appointment is not vacated or stayed for one hundred twenty (120) days or, if the appointment is stayed, for one hundred twenty (120) days after the expiration of the stay during which period the appointment is not vacated;

1.15.8   if the Member is an individual, the Member's death, incapacity, or adjudication by a court of competent jurisdiction as incompetent to manage the Member's person or property;

1.15.9   if the Member is acting as a Member by virtue of being a trustee of a trust, the termination of the trust;

1.15.10   if the Member is a partnership or limited liability company, the dissolution and commencement of winding up of the partnership or limited liability company;

1.15.11   if the Member is a corporation, the dissolution of the corporation or the revocation of its charter;

1.15.12   if the Member is an estate, the distribution by the fiduciary of the estate's entire interest in the Company;

1.16   "Law" means the New York Limited Liability Company Law, as amended from time to time.

1.17   "Member" means each Person signing this Agreement and any Person who subsequently is admitted as a member of the Company.

1.18   "Membership Interest" means all of the rights of a Member in the Company, including a Member's: (i) Economic Interest; (ii) right to inspect the Company's books and records; (iii) right to participate in the management of and vote on matters coming before the Company; and (iv) unless this Agreement or the Articles of Organization provide to the contrary, right to act as an agent of the Company.

1.19   "Member Loan Nonrecourse Deductions" means any Company deductions that would be Nonrecourse Deductions if they were not attributable to a loan made or guaranteed by a Member within the meaning of Regulation Section 1.704-2(i).

1.20   "Minimum Gain" has the meaning set forth in Regulation Section 1.704-2(d). Minimum Gain shall be computed separately for each Economic Interest Holder in a manner consistent with the Regulations under Code Section 704(b).

1.21   "Negative Capital Account" means a Capital Account with a balance of less than zero.

1.22   "Nonrecourse Deductions" has the meaning set forth in Regulation Section 1.704-2(b)(1). The amount of Nonrecourse Deductions for a taxable year of the Company equals the net increase, if any, in the amount of Minimum Gain during that taxable year, determined according to the provisions of Regulation Section 1.704-2(c).

1.23  "Nonrecourse Liability" means any liability of the Company with respect to which no Member has personal liability, as determined in accordance with Code Section 752 and the Regulations promulgated thereunder.

1.24  "Percentage" means, as to a Member, the percentage set forth after the Member's name on Exhibit A, as amended from time to time, and as to an Economic Interest Holder who is not a Member, the Percentage of the Member whose Economic Interest has been acquired by such Economic Interest Holder, to the extent the Economic Interest Holder has succeeded to that Member's Economic Interest.

1.25  "Person" means and includes an individual, corporation, partnership, association, limited liability company, trust, estate, or other entity.

1.26  "Positive Capital Account" means a Capital Account with a balance greater than zero.

1.27  "Profit" and "Loss" means, for each taxable year of the Company (or other period for which Profit or Loss must be computed), the Company's taxable income or loss determined in accordance with Code Section 703(a), with the following adjustments:

1.27.1  all items of income, gain, loss, deduction, or credit required to be stated separately pursuant to Code Section 703(a)(1) shall be included in computing taxable income or loss; and

1.27.2  any tax-exempt income of the Company, not otherwise taken into account in computing Profit or Loss, shall be included in computing taxable income or loss; and

1.27.3  any expenditures of the Company described in Code Section 705(a)(2)(B) (or treated as such pursuant to Regulation Section 1.704- 1 (b)(2)(iv)(i)) and taken into account in computing Profit or Loss, shall be subtracted from taxable income or loss; and

1.27.4  gain or loss resulting from any taxable disposition of Company property shall be computed by reference to the adjusted book value of the property disposed of, notwithstanding the fact that the adjusted book value differs from the adjusted basis of the property for federal income tax purposes; and

1.27.5  in lieu of the depreciation, amortization, or cost recovery deductions allowable in computing taxable income or loss, there shall be taken into account the depreciation computed based upon the adjusted book value of the asset; and

1.27.6  notwithstanding any other provision of this definition, any items which are specially allocated pursuant to Section 4.3 hereof shall not be taken into account in computing Profit or Loss.

1.28  "Regulation" means the income tax regulations, including any temporary regulations, from time to time promulgated under the Code.

1.29  "Transfer" means, when used as a noun, any sale, hypothecation, pledge, assignment, attachment, or other transfer, and, when used as a verb, means to sell, hypothecate, pledge, assign, or otherwise transfer.

1.30  "Voluntary Withdrawal" means a Member's disassociation with the Company by means other than a Transfer or an Involuntary Withdrawal.

## Article 2
## Formation and Name: Office; Purpose; Term

2.1  Organization.  The parties shall organize a limited liability company pursuant to the Law and the provisions of this Agreement and, for that purpose, shall cause Articles of Organization to be executed and filed with the New York Department of State.

2.2  Name of the Company.  The name of the Company shall be 829 Realty LLC.  The Company may do business under that name and under any other name or names which the Manager selects.  If the Company does business under a name other than that set forth in its Articles of Organization, then the Company shall file a certificate with the Department of State as required by General Business Law § 130.

2.3  Purpose.  The sole purpose of the company is to purchase the Premises known as 829 Greenwood Avenue, Brooklyn, New York (the "Premises").  The company is authorized to acquire, buy, sell, own, trade in, hold, develop, lease, manage, subdivide, and otherwise deal in and with the Premises and the

improvements thereon and to do any and all things necessary, convenient, or incidental to that purpose. For so long as the Loan (hereinafter defined) encumbers the premises, this company shall not engage in any business or activity other than the purpose stated in this section 2.3.

2.4 _Term._ The term of the Company shall begin upon the filing of Articles of Organization with the Department of State. The Company shall have a perpetual existence unless terminated in accordance with the provisions of this Agreement.

2.5 _Registered Agent._ The name and address of the Company's registered agent in the State of New York shall be the New York Secretary of State.

2.6 _Members._ The name, present mailing address, and Percentage of each Member are set forth on Exhibit A.

## Article 3
## Members; Capital; Capital Accounts

3.1 _Initial Capital Contributions._ Upon the execution of this Agreement, the Members shall contribute to the Company cash in the amounts respectively set forth on Exhibit A as initial contributions.

3.2 _Additional Capital Contributions._

3.2.1 If the Manager at any time or from time to time determines that the Company requires additional Capital Contributions, then the Manager shall give notice to each Member of (i) the total amount of additional Capital Contributions required, (ii) the reason the additional Capital Contribution is required, (iii) each Member's proportionate share of the total additional Capital Contribution (determined in accordance with this Section), and (iv) the date each Member's additional Capital Contribution is due and payable, which date shall be thirty (30) days after the notice has been given. A Member's share of the total additional Capital Contribution shall be equal to the product obtained by multiplying the Member's Percentage and the total additional Capital Contribution required. A Member's share shall be payable in cash or by certified check, or wire transfer.

3.2.2 Except as provided in Section 3.2.1, no Member shall be required to contribute any additional capital to the Company, and no Member shall have any personal liability for any

obligation of the Company.

     3.2.3 If a Member fails to pay when due all or any portion of any Capital Contribution, the Manager shall request the non-defaulting Members to pay the unpaid amount of the defaulting Members Capital Contribution (the "Unpaid Contribution"). To the extent the Unpaid Contribution is contributed by any other Member, the defaulting Member's Percentage shall be reduced and the Percentage of each Member who makes up the Unpaid Contribution shall be increased, so that each Member's Percentage is equal to a fraction, the numerator of which is that Member's total Capital Contribution and the denominator of which is the total Capital Contributions of all Members. The Manager shall amend Exhibit A accordingly. This remedy is in addition to any other remedies allowed by law or by this Agreement.

     3.3 <u>No Interest on Capital Contributions.</u> Economic Interest Holders shall not be paid interest on their Capital Contributions.

     3.4 <u>Return of Capital Contributions.</u> Except as otherwise provided in this Agreement, no Economic Interest Holder shall have the right to receive any return of any Capital Contribution.

     3.5 <u>Form of Return of Capital.</u> If an Economic Interest Holder is entitled to receive a return of a Capital Contribution, the Economic Interest Holder shall not have the right to receive anything but cash in return of the Economic Interest Holder's Capital Contribution.

     3.6 <u>Capital Accounts.</u> A separate Capital Account shall be maintained for each Economic Interest Holder.

     3.7 <u>Loans.</u> Any Member other than the Manager may, at any time, make or cause a loan to be made to the Company in any amount and on such terms as shall be approved by the Manager. The Manager, may, at any time, make or cause a loan to be made to the Company in any amount and on such terms as approved by a majority in interest of the Members other than the Manager.

## Article 4
### Profit, Loss, and Distributions

     4.1 <u>Distributions of Cash Flow and Allocations of Profit or Loss Other than Capital Transactions.</u>

4.1.1   <u>Profit or Loss Other Than from a Capital Transaction.</u>  After giving effect to the special allocations set forth in Section 4.3, for any taxable year of the Company, Profit or Loss (other than Profit or Loss resulting from a Capital Transaction, which Profit or Loss shall be allocated in accordance with the provisions of Sections 4.2.1 and 4.2.2) shall be allocated to the Economic Interest Holders in proportion to their Percentages.

4.1.2   <u>Cash Flow.</u>  Cash Flow for each taxable year of the Company shall be distributed to the Economic Interest Holders in proportion to their Percentages no later than ninety (90) days after the end of the taxable year.

4.2   <u>Distributions of Capital Proceeds and Allocation of Profit or Loss from Capital Transactions.</u>

4.2.1   <u>Profit.</u>  After giving effect to the special allocations set forth in Section 4.3, Profit from a Capital Transaction shall be allocated as follows:

4.2.1.1   If one or more Economic Interest Holders has a Negative Capital Account, to those Economic Interest Holders, in proportion to their Negative Capital Accounts, until all of those Negative Capital Accounts have been increased to zero.

4.2.1.2   To the Economic Interest Holders in accordance with, and in the order and priority of, the cumulative distributions made (other than distributions representing in the judgement of the Manager, a return of capital which are hereinafter referred to as "Excluded Distributions") pursuant to this Agreement with respect to the current fiscal year and for all prior fiscal years until the aggregate amount allocated to each Member pursuant to this Section 4.2.1.2 equals the aggregate amount distributed to each Member (other than Excluded Distributions) pursuant to Article 4; <u>provided, however,</u> that if the Profits allocable under this Section for the current fiscal year and all prior fiscal years exceed the cumulative distributions (other than Excluded Distributions) pursuant to Article 4 with respect to the current fiscal year and all prior fiscal years (the "Excess Profits") the portion of the Excess Profits derived in the current fiscal year shall be allocated to the Members in accordance with, and in the order and priority of, the Distributions that would have been made pursuant to Article 4 had distributions been made in the current fiscal year in an amount equal to the Excess Profits derived in the current fiscal year.

4.2.2 <u>Loss.</u> After giving effect to the special allocations set forth in Section 4.3, Loss from a Capital Transaction shall be allocated as follows:

4.2.2.1 If one or more Economic Interest Holders has a Positive Capital Account, to those Economic Interest Holders, in proportion to their Positive Capital Accounts, until all Positive Capital Accounts have been reduced to zero.

4.2.2.2 Any Loss not allocated to reduce Positive Capital Accounts to zero pursuant to Section 4.2.2.1 shall be allocated to the Economic Interest Holders in proportion to their Percentages.

4.2.3 <u>Capital Proceeds.</u> Capital Proceeds shall be distributed and applied by the Company in the following order and priority:

4.2.3.1 to the payment of all expenses of the Company incident to the Capital Transaction; then

4.2.3.2 to the payment of debts and liabilities of the Company then due and outstanding (including all debts due to any Economic Interest Holder); then

4.2.3.3 to the establishment of any reserves which the Manager deems necessary for liabilities or obligations of the Company; then

4.2.3.4 the balance shall be distributed as follows:

4.2.3.4.1 to the Economic Interest Holders in proportion to their Adjusted Capital Balances, until their remaining Adjusted Capital Balances have been paid in full;

4.2.3.4.2 the balance, to the Economic Interest Holders in proportion to their Percentages.

4.3 <u>Regulatory Allocations.</u>

4.3.1 <u>Qualified Income Offset.</u> No Economic Interest Holder shall be allocated Losses or deductions if the allocation causes the Economic Interest Holder to have an Adjusted Capital Account Deficit. If an Economic Interest Holder receives (1) an allocation of Loss or deduction (or item thereof) or (2) any distribution, which causes the Economic Interest Holder to have an Adjusted Capital Account Deficit at the end of any taxable

year, then all items of income and gain of the Company
(consisting of a pro rata portion of each item of Company income,
including gross income and gain) for that taxable year shall be
allocated to that Economic Interest Holder, before any other
allocation is made of Company items for that taxable year, in the
amount and in proportions required to eliminate the excess as
quickly as possible.  This Section 4.3.1 is intended to comply
with, and shall be interpreted consistently with, the "qualified
income offset" provisions of the Regulations promulgated under
Code Section 704(b).

4.3.2  <u>Minimum Gain Chargeback.</u>  Except as set forth in
Regulation Section 1.704-2(f)(2), (3), and (4), if, during any
taxable year, there is a net decrease in Minimum Gain, each
Economic Interest Holder, prior to any other allocation pursuant
to this Article 4, shall be specially allocated items of gross
income and gain for such taxable year (and, if necessary,
subsequent taxable years) in an amount equal to that Economic
Interest Holder's share of the net decrease of Minimum Gain,
computed in accordance with Regulation Section 1.704-2(g).
Allocations of gross income and gain pursuant to this Section
4.3.2 shall be made first from gain recognized from the
disposition of Company assets subject to nonrecourse liabilities
(within the meaning of the Regulations promulgated under Code
Section 752), to the extent of the Minimum Gain attributable to
those assets, and thereafter, from a pro rata portion of the
Company's other items of income and gain for the taxable year.
It is the intent of the parties hereto that any allocation
pursuant to this Section 4.3.2 shall constitute a "minimum gain
chargeback" under Regulation Section 1.704-2(f).

4.3.3  <u>Contributed Property and Book-ups.</u>  In
accordance with Code Section 704(c) and the Regulations
thereunder, as well as Regulation Section 1.704-
1(b)(2)(iv)(d)(3), income, gain, loss, and deduction with respect
to any property contributed (or deemed contributed) to the
Company shall, solely for tax purposes, be allocated among the
Economic Interest Holders so as to take account of any variation
between the adjusted basis of the property to the Company for
federal income tax purposes and its fair market value at the date
of contribution (or deemed contribution).  If the adjusted book
value of any Company asset is adjusted as provided herein,
subsequent allocations of income, gain, loss, and deduction with
respect to the asset shall take account of any variation between
the adjusted basis of the asset for federal income tax purposes
and its adjusted book value in the manner required under Code
Section 704(c) and the Regulations thereunder.

4.3.4   <u>Code Section 754 Adjustment.</u>   To the extent an adjustment to the tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Regulation Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of the adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases basis), and the gain or loss shall be specially allocated to the Economic Interest Holders in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to that Section of the Regulations.

4.3.5   <u>Nonrecourse Deductions.</u>   Nonrecourse Deductions for a taxable year or other period shall be specially allocated among the Economic Interest Holders in proportion to their Percentages.

4.3.6   <u>Member Loan Nonrecourse Deductions.</u>   Any Member Loan Nonrecourse Deduction for any taxable year or other period shall be specially allocated to the Economic Interest Holder who bears the risk of loss with respect to the loan to which the Member Loan Nonrecourse Deduction is attributable in accordance with Regulation Section 1.704-2(b).

4.3.7   <u>Guaranteed Payments.</u>   To the extent any compensation paid to any Member by the Company, including any fees payable to any Member pursuant to Section 5.3 hereof, is determined by the Internal Revenue Service not to be a guaranteed payment under Code Section 707(c) or is not paid to the Member other than in the Person's capacity as a Member within the meaning of Code Section 707(a), the Member shall be specially allocated gross income of the Company in an amount equal to the amount of that compensation, and the Member's Capital Account shall be adjusted to reflect the payment of that compensation.

4.3.8   <u>Unrealized Receivables.</u>   If an Economic Interest Holder's Economic Interest is reduced (provided the reduction does not result in a complete termination of the Economic Interest Holder's Economic Interest), the Economic Interest Holder's share of the Company's "unrealized receivables" and "substantially appreciated inventory" (within the meaning of Code Section 751) shall not be reduced, so that, notwithstanding any other provision of this Agreement to the contrary, that portion of the Profit otherwise allocable upon a liquidation or dissolution of the Company pursuant to Section 4.4 hereof which is taxable as ordinary income (recaptured) for federal income tax purposes shall, to the extent possible without increasing the

total gain to the Company or to any Economic Interest Holder, be
specially allocated among the Economic Interest Holders in
proportion to the deductions (or basis reductions treated as
deductions) giving rise to such recapture.  Any questions as to
the aforesaid allocation of ordinary income (recapture), to the
extent such questions cannot be resolved in the manner specified
above, shall be resolved by the Manager.

4.3.9  <u>Withholding.</u>  All amounts required to be
withheld pursuant to Code Section 1446 or any other provision of
federal, state, or local tax law shall be treated as amounts
actually distributed to the affected Economic Interest Holders
for all purposes under this Agreement.

4.4   <u>Liquidation and Dissolution.</u>

4.4.1  If the Company is liquidated, the assets of the
Company shall be distributed to the Economic Interest Holders in
accordance with the provisions of Section 4.2.3.4.

4.4.2  No Economic Interest Holder shall be obligated
to restore a Negative Capital Account.

4.5   <u>General.</u>

4.5.1  Except as otherwise provided in this Agreement,
the timing and amount of all distributions shall be determined by
the Manager.

4.5.2  If any assets of the Company are distributed in
kind to the Economic Interest Holders, those assets shall be
valued on the basis of their fair market value, and any Economic
Interest Holder entitled to any interest in those assets shall
receive that interest as a tenant-in-common with all other
Economic Interest Holders so entitled.  Unless the Members
otherwise agree, the fair market value of the assets shall be
determined by an independent appraiser who shall be selected by
the Manager.  The Profit or Loss for each unsold asset shall be
determined as if the asset had been sold at its fair market
value, and the Profit or Loss shall be allocated as provided in
Section 4.2 and shall be properly credited or charged to the
Capital Accounts of the Economic Interest Holders prior to the
distribution of the assets in liquidation pursuant to Section
4.4.

4.5.3  All Profit and Loss shall be allocated, and all
distributions shall be made to the Persons shown on the records
of the Company to have been Economic Interest Holders as of the

last day of the taxable year for which the allocation or
distribution is to be made.  Notwithstanding the foregoing,
unless the Company's taxable year is separated into segments, if
there is a Transfer or an Involuntary Withdrawal during the
taxable year, the Profit and Loss shall be allocated between the
original Economic Interest Holder and the successor on the basis
of the number of days each was an Economic Interest Holder during
the taxable year; provided, however, the Company's taxable year
shall be segregated into two or more segments in order to account
for Profit, Loss, or proceeds attributable to a Capital
Transaction or to any other extraordinary nonrecurring items of
the Company.

4.5.4  The Manager is hereby authorized, upon the
advice of the Company's tax counsel, to amend this Article 4 to
comply with the Code and the Regulations promulgated under Code
Section 704(b); provided, however, that no amendment shall
materially affect distributions to an Economic Interest Holder
without the Economic Interest Holder's prior written consent.


## Article 5
### Management: Rights, Powers, and Duties

5.1  <u>Management.</u>

5.1.1  <u>Manager.</u>  The Company shall be managed by a
Manager, or Managers who may, but need not, be a Member.  FSG
Realty Associates, LLC is hereby designated to serve as the
initial Manager.

5.1.2  <u>General Powers.</u>  The Manager shall have full,
and complete discretion, power, and authority, subject in all
cases to the other provisions of this Agreement and the
requirements of applicable law, to manage, control, administer,
and operate the business and affairs of the Company for the
purposes herein stated, and to make all decisions affecting such
business and affairs, including, without limitation, for Company
purposes, the power to:

5.1.2.1  acquire by purchase, lease, or otherwise,
the Premises and any real property which can be annexed thereto
and to any personal property, tangible or intangible which can
enhance the Premises;

5.1.2.2  construct, operate, maintain, finance,
and improve, and to own, sell, convey, assign, mortgage, or lease
the Premises and any personal property used in conjunction

therewith;

      5.1.2.3  sell, dispose, trade, or exchange Company assets in the ordinary course of the Company's business;

      5.1.2.4  enter into agreements and contracts and to give receipts, releases, and discharges;

      5.1.2.5  purchase liability and other insurance to protect the Company's properties and business;

      5.1.2.6  borrow money for and on behalf of the Company, and, in connection therewith, execute and deliver instruments: authorizing the borrowing; creating liens on the Company's property in connection therewith; confessing judgment against the Company as security therefor; and any other and all other documents required by the lender;

      5.1.2.7  execute or modify leases with respect to any part or all of the assets of the Company;

      5.1.2.8  prepay, in whole or in part, refinance, amend, modify, or extend any mortgages or deeds of trust which may affect any asset of the Company and in connection therewith to execute for and on behalf of the Company any extensions, renewals, or modifications of such mortgages or deeds of trust;

      5.1.2.9  execute any and all other instruments and documents which may be necessary or in the opinion of the Manager desirable to carry out the intent and purpose of this Agreement, including, but not limited to, documents whose operation and effect extend beyond the term of the Company's existence;

      5.1.2.10  make any and all expenditures which the Manager, in its sole discretion, deems necessary or appropriate in connection with the management of the affairs of the Company and the carrying out of its obligations and responsibilities under this Agreement, including, without limitation, all legal, accounting and other related expenses incurred in connection with the organization and financing and operation of the Company;

      5.1.2.11  enter into any kind of activity necessary to, in connection with, or incidental to, the accomplishment of the purposes of the Company; and

      5.1.2.12  invest and reinvest Company reserves in short-term instruments or money market funds.

5.1.3   <u>Extraordinary Transactions.</u>  Notwithstanding anything to the contrary in this Agreement, the Manager shall not undertake any of the following without the approval of the Members:

5.1.3.1   any Capital Transaction;

5.1.3.2   the admission of additional Members to the Company;

5.1.3.3   the Company's engaging in business in any jurisdiction which does not provide for the registration of limited liability companies;

5.1.3.4   the Company's electing to exercise any Purchase Option pursuant to Section 6.4;

5.1.3.5   the sale, exchange, lease, mortgage, pledge, or other transfer of all or substantially all of the assets of the Company;

5.1.3.6   approval of a merger or consolidation of the Company with or into another LLC or other business entity; and

5.1.3.7   amending the articles of organization (except as permitted in Law Section 213(b)).

5.1.4   <u>Limitation on Authority of Members.</u>

5.1.4.1   No Member is an agent of the Company solely by virtue of being a Member, and no Member has authority to act for the Company solely by virtue of being a Member.

5.1.4.2   This Section 5.1 supersedes any authority granted to the Members pursuant to Section 401 of the Law.  Any Member who takes any action or binds the Company in violation of this Section 5.1 shall be solely responsible for any loss and expense incurred by the Company as a result of the unauthorized action and shall indemnify and hold the Company harmless with respect to the loss or expense.

5.1.5   <u>Removal of Manager.</u>  The Members, at any time and from time to time and with or without cause, may remove the Manager or any or all managers of the Company then acting and elect a new Manager, manager or managers or make other provisions or arrangements for the management of the Company.

## 5.2   Meetings of and Voting by Members.

5.2.1   A meeting of the Members may be called at any time by the Manger or by those Members holding at least 30 percent (30%) of the Percentages then held by Members.  Meetings of Members shall be held at the Company's principal place of business or at any other place in a county in which 50% of the members reside or if no such location exists, then in the County in which the Manager has an office within the New York City Metropolitan Area and if no such location exists, then in the County in which the Person calling the meeting has an office for the conduct of business.  In the event that no such location exists, then the meeting shall be held in the New York Metropolitan Area.  Not less than ten (10) nor more than sixty (60) days before each meeting, the Person calling the meeting shall give written notice of the meeting to each Member entitled to vote at the meeting.  The notice shall state the place, date, hour, and purpose of the meeting.  Notwithstanding the foregoing provisions, each Member who is entitled to notice waives notice if before or after the meeting the Member signs a waiver of the notice which is filed with the records of Members' meetings, or is present at the meeting in person or by proxy without objecting to the lack of notice.  Unless this Agreement provides otherwise, at a meeting of Members, the presence in person or by proxy of Members holding not less than a majority (over 50 percent) of the Percentages then held by Members constitutes a quorum.  A Member may vote either in person or by written proxy signed by the Member or by the Member's duly authorized attorney in fact.

5.2.2   Except as otherwise provided in this Agreement, the affirmative vote of Members holding a majority (over 50 percent) or more of the Percentages then held by Members shall be required to approve any matter coming before the Members.

5.2.3   In lieu of holding a meeting, the Members may vote or otherwise take action by a written instrument indicating the consent of Members holding such Percentages then held by Members as would be required for Members to take action under this operating agreement.  If such consent is not unanimous, prompt notice shall be given to those Members who have not consented in writing but who would have been entitled to vote thereon had such action been taken at a meeting.

## 5.3   Personal Service.

5.3.1   No Member shall be required to perform services for the Company solely by virtue of being a Member.  Unless approved by the Manager, no Member shall perform services for the

Company or be entitled to compensation for services performed for the Company.

5.3.2  Upon approval of Members holding three quarters (3/4) of the Percentages then held by Members, the Manager shall be entitled to compensation for services performed for the Company in such amounts as determined by such members.  The foregoing notwithstanding, upon substantiation of the amount and purpose thereof, the Manager shall be entitled to reimbursement for expenses reasonably incurred in connection with the activities of the Company.

5.4  Duties of Parties.

5.4.1  The Manager shall devote such time to the business and affairs of the Company as is necessary to carry out the Manager's duties set forth in this Agreement.

5.4.2  Except as otherwise expressly provided in Section 5.4.3, nothing in this Agreement shall be deemed to restrict in any way the rights of any Member, or of any Affiliate of any Member, to conduct any other business or activity whatsoever, and no Member shall be accountable to the Company or to any other Member with respect to that business or activity even if the business or activity competes with the Company's business.  The organization of the Company shall be without prejudice to the Members' respective rights (or the rights of their respective Affiliates) to maintain, expand, or diversify such other interests and activities and to receive and enjoy profits or compensation therefrom.  Each Member waives any rights the Member might otherwise have to share or participate in such other interests or activities of any other Member or the Member's Affiliates.

5.4.3  Each Member understands and acknowledges that the conduct of the Company's business may involve business dealings and undertakings with Members and their Affiliates.  In any of those cases, those dealings and undertakings shall be at arm's length and on commercially reasonable terms.

5.5  Liability and Indemnification.

5.5.1  The Manager shall not be liable, responsible, or accountable, in damages or otherwise, to any Member or to the Company for any act performed by the Manager within the scope of the authority conferred on the Manager by this Agreement, except for fraud, bad faith, gross negligence, or an intentional breach of this Agreement.

5.5.2   The Company shall indemnify the Manager for any act performed by the Manager within the scope of the authority conferred on the Manager by this Agreement, except for fraud, bad faith, gross negligence, or an intentional breach of this Agreement.

5.6   Power of Attorney.

5.6.1   Grant of Power.   Each Member constitutes and appoints the Manager as the Member's true and lawful attorney-in-fact ("Attorney-in-Fact"), and in the Member's name, place, and stead, to make, execute, sign, acknowledge, and file:

5.6.1.1   one or more articles of organization;

5.6.1.2   all documents (including amendments to articles of organization) which the Attorney-in-Fact deems appropriate to reflect any amendment, change, or modification of this Agreement;

5.6.1.3   any and all other certificates or other instruments required to be filed by the Company under the laws of the State of New York or of any other state or jurisdiction, including, without limitation, any certificate or other instruments necessary in order for the Company to continue to qualify as a limited liability company under the laws of the State of New York and to own and operate the Premises in the Commonwealth of Massachusetts;

5.6.1.4   one or more fictitious or trade name certificates; and

5.6.1.5   all documents which may be required to dissolve and terminate the Company and to cancel its articles of organization.

5.6.2   Irrevocability.   The foregoing power of attorney is irrevocable and is coupled with an interest, and, to the extent permitted by applicable law, shall survive the death or disability of a Member.   It also shall survive the Transfer of an Economic Interest, except that if the transferee is admitted as a Member, this power of attorney shall survive the delivery of the assignment for the sole purpose of enabling the Attorney-in-Fact to execute, acknowledge, and file any documents needed to effectuate the substitution.   Each Member shall be bound by any representations made by the Attorney-in-Fact acting in good faith pursuant to this power of attorney, and each Member hereby waives any and all defenses which may be available to contest, negate,

or disaffirm the action of the Attorney-in-Fact taken in good
faith under this power of attorney.

## Article 6
### Transfer of Interests and Withdrawal of Members

6.1  _Transfers._  No Member may Voluntarily Transfer all, or
any portion of, or any interest or rights in, the Membership
Interest owned by the Member.  Each Member hereby acknowledges
the reasonableness of this prohibition in view of the purposes of
the Company and the relationship of the Members.  The voluntary
Transfer of any Membership Interests, including Economic
Interests, in violation of the prohibition contained in this
Section 6.1 shall be deemed invalid, null and void, and of no
force or effect.  Any Person to whom Membership Interests are
attempted to be transferred in violation of this Section 6.1
shall not be entitled to vote on matters coming before the
Members, participate in the management of the Company, act as an
agent of the Company, receive distributions from the Company, or
have any other rights in or with respect to the Membership
Interests.

6.2  _Transfers to Affiliates and Family._  Notwithstanding
anything set forth in this Agreement to the contrary, any Member
may at any time, and from time to time, Transfer all, or any
portion of, or any interest or rights in, the Member's Economic
or Membership Interest to (i) any other Member; (ii) any member
of the Member's Family; (iii) any Affiliate of the Member; or
(iv) a trust wherein the member or any other person or entity
permitted by this Article to be a Transferee is the Grantor or
the beneficiary.

6.3  _Voluntary Withdrawal._  No Member shall have the right
or power to Voluntarily Withdraw from the Company, except as
otherwise provided by this Agreement.  Any withdrawal in
violation of this Agreement shall entitle the Company to damages
for breach, which may be offset against the amounts otherwise
distributable to such member.

6.4  _Involuntary Withdrawal._  Immediately upon the
occurrence of an Involuntary Withdrawal, the successor of the
Withdrawn Member shall thereupon become an Economic Interest
Holder, but shall not become a Member.  If the Company is
continued as provided in Section 7.1.3, the successor Economic
Interest Holder shall have all the rights of an Economic Interest
Holder, but shall not be entitled to receive in liquidation of

the Economic Interest, the fair market value of the Member's
Economic Interest as of the date the Member Involuntarily
withdrew from the Company.


### Article 7
### Dissolution, Liquidation, and
### Termination of the Company

7.1   _Events of Dissolution._   The Company shall be dissolved
upon the happening of any of the following events:

      7.1.1   when the period fixed for its duration in
Section 2.4 has expired;

      7.1.2   upon the written agreement of the Members
holding 2/3 or more of the Percentages then held by Members; or

      7.1.3   the occurrence of an Involuntary Withdrawal,
unless remaining Members holding 2/3 or more of the Percentages
then held by Members, within ninety (90) days after the
occurrence of the Involuntary Withdrawal, elect to continue the
business of the Company pursuant to the terms of this Agreement.

7.2   _Procedure for Winding Up and Dissolution._   If the
Company is dissolved, the Manager shall wind up its affairs.   On
winding up of the Company, the assets of the Company shall be
distributed, first, to creditors of the Company, including
Economic Interest Holders who are creditors, in satisfaction of
the liabilities of the Company, and then to the Economic Interest
Holders in accordance with Section 4.4.

7.3   _Filing of Articles of Dissolution._   If the Company is
dissolved, the Manager shall promptly file Articles of
Dissolution with the Department of State.   If there is no
Manager, then the Articles of Dissolution shall be filed by the
remaining Members; if there are no remaining Members, the
Articles shall be filed by the last Person to be a Member; if
there is neither a Manager, remaining Members, or a Person who
last was a Member, the Articles shall be filed by the legal or
personal representatives of the Person who last was a Member.

7.4   _Prohibition on liquidation of Collateral._   In the event
of a dissolution of the Company, the Company shall not liquidate
collateral securing the Loan (except as permitted under the
documents evidencing and securing the Loan (the "Loan Documents")
without the consent of Lender.   If Securities (as defined in the
Loan Documents) are outstanding, the consent of the holders of

the Securities shall also be obtained.

### Article 8
### Books, Records, Accounting, and Tax Elections

8.1  <u>Bank Accounts.</u>  All funds of the Company shall be deposited in a bank account or accounts opened in the Company's name.  It is understood however, that the Manager may designate a company ("Real Estate Management") to manage any real property on behalf of the Company at a charge of the prevailing management fee.  The Real Estate Management may collect rents and expend sums on behalf of the Company using a bank account established and controlled by the Real Estate Management.  The Manager shall determine the institution or institutions at which the accounts will be opened and maintained, the types of accounts, and the Persons who will have authority with respect to the accounts and the funds therein.

8.2  <u>Books and Records.</u>

8.2.1  The Manager or the Real Estate Management, if one is selected, shall keep or cause to be kept complete and accurate books and records of the Company and supporting documentation of the transactions with respect to the Company's business.  The records shall include, but not be limited to:

8.2.1.1  a current alphabetized list of the names and addresses of all of the members, as well as the contribution and the share of profits and losses of each member or information from which such share can be readily derived;

8.2.1.2  if the firm is managed by a Manager, manager or managers, a current alphabetized list of the names and addresses of the managers;

8.2.1.3  a copy of the articles of organization and all amendments thereto or restatements thereof, together with executed copies of any powers of attorney pursuant to which any certificate or amendment has been executed;

8.2.1.4  a copy of the operating agreement and any amendments thereto and any amended and restated operating agreement; and

8.2.1.5  a copy of the limited liability company's federal, state, and local income tax or information returns and reports, if any, for the three most recent fiscal years.

The books and records shall be maintained in accordance with sound accounting practices and shall be available at the Company's principal office for examination by any Member or the Member's duly authorized representative at any and all reasonable times during normal business hours.

8.2.2  Each Member shall reimburse the Company for all costs and expenses incurred by the Company in connection with the Member's inspection and copying of the Company's books and records.

8.3  <u>Annual Accounting Period.</u>  The annual accounting period of the Company shall be its taxable year.  The Company's taxable year shall be selected by the Manager, subject to the requirements and limitations of the Code.

8.4  <u>Reports.</u>  Within seventy-five (75) days after the end of each taxable year of the Company, the Manager shall cause to be sent to each Person who was a Member at any time during  the taxable year then ended: (i) an annual compilation report, prepared by the Company's independent accountants in accordance with standards issued by the American Institute of Certified Public Accountants; and (ii) a report summarizing the fees and other remuneration paid by the Company to any Member, the Manager, or any Affiliate in respect of the taxable year.  In addition, within seventy-five (75) days after the end of each taxable year of the Company, the Manager shall cause to be sent to each Person who was an Interest Holder at any time during the taxable year then ended, that tax information concerning the Company which is necessary for preparing the Interest Holder's income tax returns for that year.  At the request of any Member, and at the Member's expense, the Manager shall cause an audit of the Company's books and records to be prepared by independent accountants for the period requested by the Member.

8.5  <u>Tax Matters Member.</u>  The Manager shall be the Company's initial tax matters Member ("Tax Matters Member").  The Tax Matters Member shall have all powers and responsibilities provided in Code Section 6221, *et seq*.  The Tax Matters Member shall keep all Members informed of all notices from government taxing authorities which may come to the attention of the Tax Matters Member.  The Company shall pay and be responsible for all reasonable third party costs and expenses incurred by the Tax Matters Member in performing those duties.  A Member shall be responsible for any costs incurred by the Member with respect to any tax audit or tax-related administrative or judicial proceeding against any Member, even though it relates to the Company.  The Tax Matters Member shall not compromise any dispute

with the Internal Revenue Service without the approval of the Members.

8.6  **Tax Elections.**  The Manager shall have the authority to make all Company elections permitted under the Code, including, without limitation, elections of methods of depreciation and elections under Code Section 754.  The decision to make or not make an election shall be at the Manager's sole and absolute discretion.

8.7  **Title to Company Property.**

8.7.1  Except as provided in Section 8.7.2. all real and personal property acquired by the Company shall be acquired and held by the Company in its name.

8.7.2  The Manager may direct that legal title to all or any portion of the Company's property be acquired or held in a name other than the Company's name.  Without limiting the foregoing, the Manager may cause title to be acquired and held in its name or in the names of trustees, nominees, or straw parties for the Company.  It is expressly understood and agreed that the manner of holding title to the Company's property (or any part thereof) is solely for the convenience of the Company and all of that property shall be treated as Company property.

## Article 9
## General Provisions

9.1  **Assurances.**  Each Member shall execute all certificates and other documents and shall do all such filing, recording, publishing, and other acts as the Manager deems appropriate to comply with the requirements of law for the formation and operation of the Company and to comply with any laws, rules, and regulations relating to the acquisition, operation, or holding of the property of the Company.

9.2  **Notifications.**  Any notice, demand, consent, election, offer, approval, request, or other communication (collectively a "notice") required or permitted under this Agreement must be in writing and either delivered personally or sent by certified or registered mail, postage prepaid, return receipt requested or by overnight courier service, or by facsimile transmission, provided receipt is actually acknowledged by the member or member's agent. Any notice to be given hereunder by the Company shall be given by the Manager.  A notice must be addressed to a Member at the

Member's last known address on the records of the Company.  A
notice to the Company must be addressed to the Company's
principal office and any branch office operated by the Company.
A notice delivered personally will be deemed given only when
acknowledged in writing by the person to whom it is delivered.  A
notice that is sent by mail will be deemed given three (3)
business days after it is mailed.  Any party may designate, by
notice to all of the others, substitute addresses or addressees
for notices; and, thereafter, notices are to be directed to those
substitute addresses or addressees.  A notice sent by facsimile
is deemed given when receipt is acknowledged.

    9.3   <u>Specific Performance.</u>   The parties recognize that
irreparable injury will result from a breach of any provision of
this Agreement and that money damages will be inadequate to fully
remedy the injury.  Accordingly, in the event of a breach or
threatened breach of one or more of the provisions of this
Agreement, any party who may be injured (in addition to any other
remedies which may be available to that party) shall be entitled
to one or more preliminary or permanent orders (i) restraining
and enjoining any act which would constitute a breach or (ii)
compelling the performance of any obligation which, if not
performed, would constitute a breach.

    9.4   <u>Complete Agreement.</u>   This Agreement constitutes the
complete and exclusive statement of the agreement among the
Members with respect to the subject matter thereof.  It
supersedes all prior written and oral statements, including any
prior representation, statement, condition, or warranty.  Except
as expressly provided otherwise herein, this Agreement may not be
amended without the written consent of the Members holding 2/3 or
more of the Percentages then held by Members.

    9.5   <u>Applicable Law.</u>   All questions concerning the
construction, validity, and interpretation of this Agreement and
the performance of the obligations imposed by this Agreement
shall be governed by the internal law, not the law of conflicts,
of the State of New York.

    9.6   <u>Article and Section Titles.</u>   The headings herein are
inserted as a matter of convenience only and do not define,
limit, or describe the scope of this Agreement or the intent of
the provisions hereof.

    9.7   <u>Binding Provisions.</u>   This Agreement is binding upon,
and inures to the benefit of, the parties hereto and their
respective heirs, executors, administrators, personal and legal
representatives, successors, and permitted assigns.

9.8   <u>Exclusive Jurisdiction and Venue.</u>   Any suit involving any dispute or matter arising under this Agreement may only be brought in a United States District Court located in the State of New York or any New York State Court having jurisdiction over the subject matter of the dispute or matter.   All Members hereby consent to the exercise of personal jurisdiction by any such court with respect to any such proceeding.

9.9   <u>Terms.</u>   Common nouns and pronouns shall be deemed to refer to the masculine, feminine, neuter, singular, and plural, as the identity of the Person may in the context require.

9.10   <u>Separability of Provisions.</u>   Each provision of this Agreement shall be considered separable; and if, for any reason, any provision or provisions herein are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid.

9.11   <u>Counterparts.</u>   This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original and all of which, when taken together, constitute one and the same document.   The signature of any party to any counterpart shall be deemed a signature to, and may be appended to, any other counterpart.

9.12   <u>Estoppel Certificate.</u>   Each Member shall, within ten (10) days after written request by the Manager, deliver to the requesting Person a certificate stating, to the Member's knowledge, that: (i) this Agreement is in full force and effect; (ii) this Agreement has not been modified except by any instrument or instruments identified in the certificate; and (iii) there is no default hereunder by the requesting Person, or if there is a default, the nature and extent thereof.

## Article 10
## Special Purpose Entity

10.1   <u>Special Purpose Entity.</u>   Notwithstanding anything to the contrary contained herein, for so long as the loan made by GMAC Commercial Mortgage ("Lender") to the Company is outstanding, the Company will not further encumber the Premises.   The term Lender, includes its transferees, successors and assigns.   The loan from the Lender to the Company may be referred to in this Operating Agreement as the "Loan" or "First Mortgage Loan".)   So long as the Loan encumbers the Premises, the Company covenants and agrees that it has not and shall not:

10.1.1  engage in any business or activity other than the ownership, operation and maintenance of the Premises, and activities incidental thereto;

10.1.2  acquire or own any material assets other than (i) the Premises, and (ii) such incidental personal property as may be necessary for the operation of the Premises;

10.1.3  merge into or consolidate with any Person, or dissolve, terminate, liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure (the term "Person" shall include an individual, corporation, limited liability company, partnership, trust, unincorporated association, government, governmental authority, and any other entity);

10.1.4  fail to observe all organization formalities, or fail to preserve its existence as an entity duly organized, validly existing and in good standing (if applicable) under the laws of the jurisdiction of its organization or formation, or amend, modify, terminate or fail to comply with the provision of this Agreement or similar organizational documents;

10.1.5  Own any subsidiary or make any investment in, any Person;

10.1.6  Commingle its assets with the assets of any other Person;

10.1.7  incur any indebtedness or assume or guaranty any indebtedness other than the First Mortgage Loan and unsecured trade debt incurred in the ordinary course of business which is payable within sixty (60) days of when incurred, provided that the total outstanding amount of such trade debt does not exceed any maximum amount provided in the Loan Agreement at any one time;

10.1.8  fail to maintain its records, books of account, bank accounts, financial statements, accounting records and other entity documents separate and apart from those of any other Person;

10.1.9  amend or cause to be amended this Operating Agreement with respect to changing the sole purpose of the Company or the separateness covenants contained in this Article;

10.1.10  take any action that might cause the Company to become insolvent;

10.1.11  enter into any contract or agreement with any general partner, member, shareholder, principal or affiliate, except upon terms and conditions that are intrinsically fair, and substantially similar to those that would be available on an arm's-length basis with unaffiliated third parties thereby maintaining an arm's length relationship with its affiliates and enter into transactions with affiliates only on a commercially reasonable basis;

10.1.12  maintain its assets in such a manner that it will be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

10.1.13  assume or guaranty the debts of any other Person, hold itself out to be responsible for the debts of any other Person, or otherwise pledge its assets for the benefit of any other Person or hold out its credit as being available to satisfy the obligations of any other Person;

10.1.14  make any loans or advances to any Person;

10.1.15  fail to file its own tax returns (unless prohibited by applicable laws from doing so);

10.1.16  fail either to hold itself out to the public as a legal entity separate and distinct from any other Person or to conduct its business solely in its own name or fail to correct any known misunderstanding regarding its separate identity;

10.1.17  fail to maintain adequate capital for the normal obligations reasonable foreseeable in a business of its size and character and in light of its contemplated business operation;

10.1.18  fail to pay its own liabilities (including, without limitation, salaries of its own employees) from its own funds;

10.1.19  fail to allocate shared expenses (including, without limitation, shared office space) and to use separate stationery, invoices and checks;

10.1.20  acquire obligations or securities of its partners, members, shareholders or affiliates, as applicable;

10.1.21  fail to maintain its books, records, resolutions and agreements as official records;

   10.1.22 pledge its assets for the benefit of any other person or entity, other than in connection with the Loan;

   10.1.23 identify its members or any affiliates thereof as a division or part of it; and

   10.1.24 fail to maintain a sufficient number of employees in light of its contemplated business operation.

  10.2 <u>Special Purpose Manager.</u> So long as the First Mortgage Loan is outstanding, the Company shall have at least one Manager (the "Special Purpose Manager" or "SPM") that is an entity that complies with all of the criteria described in this Article except as modified to reflect the SPM's position as a Manager of the Company that has at least a one percent (1.0%) ownership interest in the Company. The SPM shall have at least one Independent Director. An "Independent Director" shall mean a person or entity who is a member or Manager of the SPM who is not at the time of initial appointment and has not been at any time during the preceding five (5) years and shall not be at any time while serving as Independent Director; (a) a stockholder, director, officer, employee, partner or member of the Special Purpose Manager or the Company of any affiliate of either of them; (b) a customer, supplier or other person who derives more than 10% of its purchases or revenues from its activities with the Special Purpose Manager or the Company or any affiliate of either of them, (c) a person or other entity controlling or under common control with any such stockholder, director, officer, employee, partner, member, customer, supplier or other person, or (d) to a member of the immediate family of any such stockbroker, director, officer, employee, partner, member, customer, supplier or other person. As used herein, the term "control" means the possession, directly or indirectly, of a person or entity, whether through ownership of voting securities, by contract or otherwise.

  10.3  <u>Unanimous Consent.</u> Notwithstanding any other provision of this Operating Agreement to the contrary, the unanimous consent of all partners (including that of the Special Purpose Manager which will in turn require the vote of an Independent Director) is required for the Company to:

   10.3.1 institute proceedings to be adjudicated bankrupt or insolvent;

   10.3.2 consent to the institution of bankruptcy or insolvency proceedings against it;

10.3.3    file a petition seeking, or consent to, reorganization or reflect under any applicable federal or state law relating to bankruptcy;

10.3.4    seek or consent to the appointment of a receiver, liquidator, conservator, assignee, trustee, sequestrator, custodian, or any other similar official of the Company or a substantial part of its properties;

10.3.5    make any assignment for the benefit of creditors;

10.3.6    admit in writing its inability to pay its debts generally as they become due;

10.3.7    otherwise seek relief under any laws relating to the relief from debts or the protection of debtors generally;

10.3.8    take any action in furtherance of any of the preceding actions;

10.3.9    engage in transactions with affiliates except as is permitted in section 10.2, above; or

10.3.10    except as otherwise provided in this Article, amend the organizational documents of the Company.

10.4    <u>Solvent Manager.</u>  If there are one or more Managers of the Company in addition to the Special Purpose Manager, notwithstanding any other provision of this Operating Agreement to the contrary, the Company shall continue (and not dissolve) for so long as a solvent Manager exists.

10.5    Notwithstanding any other provision of this Operating Agreement to the contrary, so long as the First Mortgage Loan is outstanding, no Member of the Company may transfer any direct or indirect ownership interest in the Company such that the transferee owns more than a percentage interest in the Company as specified in the Loan Agreement, unless such transfer is conditioned upon the delivery of an acceptable Non-Consolidation Opinion (as defined below) to the Lender and to any nationally recognized rating agency which has been requested by the Lender or any transferee of the Lender to rate any issue of securities issued in respect of a pool of mortgage loans which includes the First Mortgage Loan (the "Certificates") and which is then rating, or expected to rate, such Certificates such (individually, a "Rating Agency"), concerning, as applicable, the Company, the new transferee and/or their respective owners.

For purposes of this Paragraph "Non-Consolidation Opinion" shall mean an opinion of counsel to the Company (reasonably satisfactory to the Lender and each Rating Agency in form and substance, from counsel reasonably satisfactory to the Lender and each Rating Agency and containing assumptions, limitations and qualifications customary for opinions of such type) to the effect that a court of competent jurisdiction is a proceeding under the United States Bankruptcy Code would not consolidate the assets and liabilities of the Company with those of any partner or affiliate thereof which became a debtor under the United States Bankruptcy Code, and if applicable to the Company, that such transfer would not be a fraudulent conveyance under the United States Bankruptcy Code.

IN WITNESS WHEREOF, the parties have executed, or caused this Agreement to be executed, under seal, as of the date set forth hereinabove.

Manager:

FSG Realty Associates, LLC

By: _____
    Pinchos David Shemano, Member

MEMBERS:

_____
Pinchos David Shemano

SF Family Credit Service Trust

By: _____
    Shaindy Finkelstein, Trustee

PD Family Credit Shelter Trust

By: _____
    Dina Gutfreund, Trustee

**829 Realty LLC**
**Operating Agreement**

### Exhibit A
#### List of Members, Capital, and Percentages

| Name and Address | Capital | Percentages |
|---|---|---|
| **Manager Member** | | |
| FSG Realty Associates, LLC<br>c/o David Shemano<br>2158 82nd Street<br>Brooklyn, New York 11214 | $500.00 | 1 |
| **Member** | | |
| Pinchos (David) Shemano<br>2158 82nd Street<br>Brooklyn, NY 11214 | $16,500.00 | 33 |
| **Member** | | |
| PD Family Credit Shelter Trust<br>c/o Mier Gutfreund<br>1938 53rd Street<br>Brooklyn, NY 11204 | $16,500.00 | 33 |
| **Member** | | |
| SF Family Credit Service Trust<br>c/o Jacob Finkelstein<br>501 Avenue F<br>Brooklyn, NY 11218 | $16,500.00 | 33 |

**EXHIBIT E**

# ASSIGNMENT OF MEMBERSHIP INTEREST

## PINCHOS D. SHEMANO

In consideration of ten ($10.00) Dollars and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Pinchos D. Shemano ("Assignor") hereby assigns to The SF Family Credit Shelter Trust ("Assignee") his thirty-three (33%) percent membership interest in 829 Realty LLC (the "Membership Interest"). Assignee accepts the assignment of the Membership Interest without reliance upon any information supplied by the Assignor not set forth in this Assignment. Assignor represents that he has not previously assigned, pledged, hypothecated or transferred the Membership Interest and he is the person who is authorized to transfer the Membership Interest to the Assignee.

This assignment shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

This Assignment of Membership Interest may be executed and sent by facsimile or e-mail and signature hereon sent as an attachment as a PDF document by e-mail shall be deemed an original for all purposes.

Dated: As of May 25, 2011

## SIGNATURE PAGE FOLLOWS

(819/829 Greenwood Avenue-jhr-Shemano-assmts-llc interestsSF)

1

IN WITNESS WHEREOF Assignor has caused this Assignment of Membership Interest to be executed and delivered as of the date set forth above.

ASSIGNOR:

Pinchos D. Shemano

2

# EXHIBIT F

## ASSIGNMENT OF MEMBERSHIP INTEREST

## THE SF FAMILY CREDIT SHELTER TRUST

In consideration of ten ($10.00) Dollars and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, The SF Family Credit Shelter Trust ("Assignor") hereby assigns to Yocheved Orlinsky and Miriam Telowitz (each an "Assignee" and collectively the "Assignees") a thirty-three (33%) percent membership interest in 829 Realty LLC (the "Membership Interest"). Assignees accept the assignment of the Membership Interest without reliance upon any information supplied by the Assignor not set forth in this Assignment. Assignor represents that it has not previously assigned, pledged, hypothecated or transferred the Membership Interest and it is authorized to transfer the Membership Interest to the Assignee.

This assignment shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

This Assignment of Membership Interest may be executed and sent by facsimile or e-mail and signature hereon sent as an attachment as a PDF document by e-mail shall be deemed an original for all purposes.

Dated:  As of May 25, 2011

### SIGNATURE PAGE FOLLOWS

IN WITNESS WHEREOF Assignor has caused this Assignment of Membership Interest to be executed and delivered as of the date set forth above.

ASSIGNOR:

The SF Family Credit Shelter Trust

By: _____
Shaindel Finkelstein, Trustee

STATE OF NEW YORK    )
                     ) ss:
COUNTY OF KINGS      )

On this 25th day of May, 2011 before me, the undersigned, a notary public in and for said State, personally appeared Shaindel Finkelstein, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in this capacity and that by his signature on the instrument, the individual, or the person on behalf of which the individual acted, executed the instrument.

GEDALIA MARYL
Notary Public - State of New York
No. 01MA6226310
Qualified in Kings County
My Commission Expires August 9, 2014

_____
Notary Public

(819/829 Greenwood Avenue- The SF Family Credit Shelter Trust to YO & MT-jhr-assmts-llc interests)

2

FILED: KINGS COUNTY CLERK 08/31/2011

NYSCEF DOC. NO. 2-10

INDEX NO. 500665/2011

RECEIVED NYSCEF: 08/31/2011

**EXHIBIT G**

## ASSIGNMENT OF MEMBERSHIP INTEREST

## YOCHEVED ORLINSKY & MIRIAM TELOWITZ

In consideration of ten ($10.00) Dollars and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Yocheved Orlinsky and Miriam Telowitz (each an "Assignor" and collectively the "Assignors") hereby jointly assign to Ortel Plaza LLC ("Assignee") their thirty-three (33%) percent membership interest in 829 Realty LLC (the "Membership Interest"). Assignee accepts the assignment of the Membership Interest without reliance upon any information supplied by the Assignor not set forth in this Assignment. Assignors represent that they have not previously assigned, pledged, hypothecated or transferred the Membership Interest and they are the persons who are authorized to transfer the Membership Interest to the Assignee.

This assignment shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

This Assignment of Membership Interest may be executed and sent by facsimile or e-mail and signature hereon sent as an attachment as a PDF document by e-mail shall be deemed an original for all purposes.

Dated:  As of May 25, 2011

### SIGNATURE PAGE FOLLOWS

IN WITNESS WHEREOF Assignors have caused this Assignment of Membership Interest to be executed and delivered as of the date set forth above.

**ASSIGNORS**:

Yocheved Orlinsky

Miriam Telowitz

**EXHIBIT H**

# BERKADIA™
## Commercial Mortgage

| | |
|---|---|
| | **Messages** |
| | Please note new lockbox address: Berkadia<br>P.O. Box 308<br>Horsham PA 19044<br>Attn: Funds App-A |

**Property:** ROSE GARDEN APARTMENTS (STERN    **Loan No:** 11029410    **Interest Rate:** 7.91000

| BALANCE INFORMATION AS OF 04/18/2011 | | PAYMENT INFORMATION FOR 05/05/2011 | |
|---|---|---|---|
| Principal Balance | 7,159,313.74 | Principal | 11,008.21 |
| Interest Paid YTD | 181,054.35 | Interest | 47,191.81 |
| Deferred Int to Date | | R.E. Taxes | 46,129.32 |
| Tax Escrow Balance | 241,891.74 | Property Insurance | 3,261.47 |
| Insurance Escrow Balance | 33,002.85 | Reserves | 3,093.75 |
| Reserve Balance | 223,781.66 | FHA/MIP | |
| MIP Escrow Balance | | Other Escrow | |
| Other Escrow Balance | | Late Fee Due | |
| | | IRP/Subsidy | |
| Late Charge of | 2,910.00 | | |
| Due if not paid by | 05/10/2011 | | |

| | | |
|---|---|---|
| | **Total Payment Due** $ | 110,684.56 |

| | ACCOUNT ACTIVITY | 03/17/2011 | thru | 04/18/2011 | | | | |
|---|---|---|---|---|---|---|---|---|
| Date | Desc | Total | Principal | Interest | Escrows | Reserves | Late Fee | Other |
| 03/01/2011 | RESERV DR | 9.43 | | | | -9.43 | | |
| 03/01/2011 | JOI CREDIT | 37.69 | | | | 37.69 | | |
| 04/11/2011 | PMT REC'D | 110,684.56 | -9,371.32 | 46,828.70 | 49390.76 | 3,093.75 | | |

For general inquiries please call your Client Relations Manager at 1 (888) 334-4622.

| MAIL THIS PORTION WITH YOUR PAYMENT | | |
|---|---|---|
| | **Loan No.** 11029410 | |
| **Last Installment Made** | **Due Date** | **Amount Due** |
| 04/05/2011 | 05/05/2011 | 110,684.56 |

Ensure Remittance address shows through window envelope

ROSE GARDEN APARTMENTS (STERN PORT

DAVID STERN MANAGEMENT  INC
PO BOX 468
PARKVILLE STATION
BROOKLYN NY 11204

**BERKADIA AUTODEBIT **

ATTN: THIS INVOICE IS FOR
INFORMATIONAL PURPOSES ONLY.
PLEASE DO NOT REMIT ANY FUNDS.

Page  1  of  1

FILED: KINGS COUNTY CLERK 08/31/2011

NYSCEF DOC. NO. 2-12

INDEX NO. 500665/2011

RECEIVED NYSCEF: 08/31/2011

**EXHIBIT I**

# CONSOLIDATED, AMENDED AND RESTATED PROMISSORY NOTE

$8,000,000.00                                                                  May ___, 2001

WHEREAS, GMAC COMMERCIAL MORTGAGE CORPORATION, a California corporation ("Lender"), by assignment or otherwise, is the lawful owner and holder of the notes described on Exhibit A attached hereto (the "Existing Notes") which evidence indebtedness of 829 REALTY LLC, a New York limited liability company ("Borrower"), in the total existing principal amount of EIGHT MILLION 00/100 DOLLARS ($8,000,000.00); and

WHEREAS, Borrower and Lender desire to consolidate, amend and restate the terms and conditions of the Existing Notes in their entirety, in the manner hereinafter set forth, and to replace the Existing Notes with this Note.

NOW, THEREFORE, by Borrower's execution and delivery, and Lender's acceptance of delivery from Borrower, of this Note, this Note is deemed to amend, modify, restate and consolidate the Existing Notes and the Existing Notes are hereby amended, modified and restated in their entirety, and consolidated, so that this Note shall hereafter constitute evidence of but one debt and the terms, covenants, agreements, rights, obligations and conditions contained in this Note shall supersede and control the terms covenants, agreements, rights, obligations and conditions of the Existing Notes (it being agreed that the consolidation of the Existing Notes shall not impair the debt evidenced by the Existing Notes), as follows:

FOR VALUE RECEIVED, and upon the terms and conditions set forth herein, Borrower, promises to pay to the order of GMAC COMMERCIAL MORTGAGE CORPORATION, a California corporation ("Lender"), at Lender's office located at 200 Witmer Road, P.O. Box 809, Horsham, Pennsylvania 19044-0809, Attn: Servicing – Accounting Manager, or at such other place as Lender may designate to Borrower in writing from time to time, the principal sum of EIGHT MILLION DOLLARS ($8,000,000.00), or so much thereof as is outstanding and unpaid, together with interest thereon at the rate of _____ percent (___ %) per annum ("Interest Rate"), in lawful money of the United States of America, which, at the time of payment, shall be legal tender in payment of all debts and dues, public and private.

1.    COMPUTATION OF INTEREST. Interest under this Note shall be paid in arrears and shall be calculated based on a 360-day year and paid for the actual number of days elapsed for any whole or partial month in which interest is being calculated. Interest shall accrue from the date on which funds are advanced (regardless of the time of day such advance is made) through and including the day on which funds are repaid, unless payment is received by Lender prior to the time set forth in Section 2.03 hereof.

2.    PAYMENT OF PRINCIPAL AND INTEREST.

2.01    Principal and Interest Payments. Borrower shall pay principal and interest due under this Note as follows:

Borrower shall pay consecutive monthly installments of principal and interest in the amount of $_____ (each a "Monthly Amount"), beginning on the fifth day of July, 2001 ("First Payment Date"), and continuing on the fifth day of each and every successive month thereafter (each a "Payment Date") through and including the Payment Date immediately prior to the Maturity Date (as defined below); and

On the fifth day of June, 2011 ("Maturity Date"), the entire outstanding principal balance hereof, together with all accrued but unpaid interest thereon and any other amounts due under the Note or the other Loan Documents (hereafter defined) shall be due and payable in full.

2.02    Payment of Short Interest. If this Note is executed on a date other than the fifth day of a calendar month, Borrower shall pay to Lender, contemporaneously with the execution of this Note, an interest payment calculated by multiplying (a) the number of days from and including the date of this Note to and including the fourth day of such month (or if the date of this Note is after the fourth day of the month, then the next following month) (b) by a daily rate based on the Interest Rate calculated for a 360 day year.

2.03    Method of Payment. Each payment due hereunder shall not be deemed received by Lender until received on a Business Day (as hereafter defined) in Federal funds immediately available to Lender prior to 2:00 p.m. local time at the place then designated by Lender. Any payment received on a Business day after the time established by the preceding sentence, shall be deemed to have been received on the immediately following Business Day for all purposes, including, without limitation, the accrual of interest on principal.

2.04    Application of Payments. Payments under this Note shall be applied first to the payment of late fees and other costs and charges due in connection with this Note, as Lender determines in its sole discretion, then to the payment of accrued but unpaid interest, and then to reduction of the outstanding principal balance (in inverse order of maturity whether or not then due), but such application shall not reduce the amount of the fixed monthly installments required to be paid hereunder unless partial prepayments are expressly permitted in the event of partial release of collateral under Section 2.05 (b) below. No principal amount repaid may be reborrowed. All amounts due under this Note shall be payable without setoff, counterclaim or any other deduction whatsoever.

2.05    Loan Repayment and Defeasance.

(a)    Repayment. Other than as set forth in this Section 2.05, or as required or permitted pursuant hereto in connection with a casualty or condemnation, Borrower shall have no right to prepay all or any portion of the indebtedness evidenced by this Note (sometimes referred to in this Section 2.05 as "Loan") prior to May 5, 2011 ("Optional Prepayment Date"). From and after the Optional Prepayment Date, provided no Event of Default exists, the principal balance of this Note may be prepaid, in whole but not in part, upon: (i) not less than thirty (30) days prior written notice to Lender specifying the scheduled Payment Date on which prepayment is to be made (the "Prepayment Date"); (ii) payment of all accrued and unpaid interest on the outstanding principal balance of this Note through and including the Prepayment Date, and, if the Prepayment

Date is not a Payment Date, then a payment of all interest which would have accrued on the principal balance of this Note through and including the fifth day of the calendar month immediately following the calendar month in which the Prepayment Date occurs; and (iii) payment of all other sums then due under this Note, the Security Instrument and the other Loan Documents. Lender shall not be obligated to accept any prepayment of the principal balance of this Note unless it is accompanied by all sums due in connection therewith.

(b)    Voluntary Defeasance of the Note.  On or after that date ("Optional Defeasance Date") which is the earlier to occur of (i) three years after the date of this Note or (ii) two years after the Loan is sold into a securitization ("Securitization"), and subject to confirmation from applicable rating agencies ("Rating Agencies") having been obtained therefor and to the terms and conditions set forth in this Section 2.05(b), Borrower may defease all (but not less than all) of the Loan (hereinafter, "Defeasance").  Defeasance shall be subject to satisfaction of each of the following conditions precedent:

(i)    Borrower shall provide not less than thirty (30) days prior written notice to Lender specifying a date ("Defeasance Date") which shall he a Payment Date, on which the amount required to defease the Loan ("Defeasance Deposit") is to be made and on which the Defeasance is to occur, as well as the anticipated outstanding principal amount of this Note as of the Defeasance Date.

(ii)    Borrower shall pay to Lender all accrued and unpaid interest on the outstanding principal balance of this Note to but not including the Defeasance Date.

(iii)    Borrower shall pay to Lender all other sums, not including scheduled interest or principal payments, then due under this Note, the Security Instrument and any of the other Loan Documents.

(iv)    No Event of Default shall exist on the Defeasance Date.

(v)    Borrower shall pay to Lender the required Defeasance Deposit for the Defeasance.

(vi)    Borrower shall execute and deliver one or more security agreements in form and substance satisfactory to Lender (collectively, "Security Agreement"), creating a first priority lien on, and security interest in, the Defeasance Deposit and the U.S. Government Securities purchased with Defeasance Deposit in accordance with the provisions of Section 2.05(c).

(vii)    Borrower shall deliver to Lender an opinion of Borrower's counsel, which opinion shall be in form and substance satisfactory to Lender in its sole discretion, stating, among other things, that Lender has a perfected first priority security interest in the U.S. Government Securities purchased with the Defeasance Deposit.

(viii)    If required by the applicable Rating Agencies, Borrower also shall

deliver or cause to be delivered from Borrower's counsel a non-consolidation opinion with respect to the Successor Borrower (as defined below), if any, which opinion shall be in form and substance satisfactory to Lender in its sole discretion and to the applicable Rating Agencies. In addition, if the Loan is included in any REMIC formed pursuant to a Securitization, Borrower also shall deliver or cause to be delivered an opinion of Borrower's counsel, which opinion shall be in form and substance satisfactory to Lender in its sole discretion, stating that (A) after a Defeasance, the Loan will continue to be a "qualified mortgage" within the meaning of Section 860G of the United States Internal Revenue Code (as now or hereafter amended, "Code") and (B) the REMIC will not fail to maintain its status as a "real estate mortgage investment conduit" within the meaning of Section 860D of the Code as a result of such Defeasance.

(ix)    Borrower shall deliver to Lender a certification from Borrower, in form and substance satisfactory to Lender, certifying that the requirements set forth in this Section 2.05(b) have been satisfied.

(x)    Borrower shall deliver such other certificates, documents or instruments as Lender may reasonably request, all of which shall be in form and substance acceptable to Lender.

(xi)    Borrower shall pay all reasonable costs and expenses of Lender incurred in connection with the Defeasance, including any costs and expenses associated with the Release Instruments (as defined in Section 2.05(f) hereof) and reasonable attorneys fees and expenses.

(xii)    Borrower shall deliver to Lender a confirmation, in form and substance satisfactory to Lender, by a "Big Five" independent certified public accounting firm, that Defeasance Deposit is sufficient to pay all Scheduled Defeasance Payments and other amounts required to be paid by Borrower hereunder in connection with the proposed Defeasance.

(xiii)    Borrower shall deliver to Lender confirmation, in form and substance satisfactory to Lender, that all conditions to Defeasance have been met from any applicable Rating Agency that has required as a condition to Defeasance that such conditions have been met.

(c)    Purchase of U.S. Government Securities. In connection with the Defeasance of this Note, Borrower hereby appoints Lender as its agent and attorney-in-fact for the purpose of using the Defeasance Deposit to purchase U.S. Government Securities (which purchases, if made by Lender, shall be made on an arms-length basis at then prevailing market rates) which provide payments on or prior to, but as close as possible to, all successive Payment Dates after the Defeasance Date, (including the outstanding principal balance of this Note due on the Maturity Date), and in amounts equal to the full amounts due on each Payment Date under this Note ("Scheduled Defeasance Payments"). Borrower, pursuant to the Security Agreement or other appropriate document, shall irrevocably authorize and direct that the payments received from the U.S. Government Securities may be made directly to Lender and applied to satisfy the obligations of the Borrower under this Note. In connection with the Defeasance of the Loan, any portion of the Defeasance Deposit in excess of the amount necessary to purchase the U.S. Government Securities required by this Section 2.05 (c) and satisfy Borrower's obligations under Section 2.05

shall be remitted to Borrower. Any amounts received in payment on the U.S. Government Securities in excess of the amounts necessary to make monthly payments pursuant to Section 2 (including payments due on the Maturity Date) shall be treated in accordance with the terms of Section 2.04 hereof.

(d)    Successor Borrower Option. If requested by Borrower, in connection with a Defeasance of the Loan, Lender, at Borrower's expense, shall establish or designate one or more successor entities ("Successor Borrower") and Borrower shall transfer and assign all obligations, rights and duties under and to this Note, together with the pledged U.S. Government Securities, to the Successor Borrower. The obligation of the Lender to establish or designate a Successor Borrower shall be retained by the original Lender named herein notwithstanding the sale or transfer of this Loan unless such obligation is specifically assumed by the transferee. The Successor Borrower shall assume in writing the obligations under this Note, the Security Agreement and the other Loan Documents, by agreements in form and substance satisfactory to Lender, whereupon Borrower shall be relieved of its obligations thereunder. Borrower shall pay $1,000 to any such Successor Borrower as consideration for assuming Borrower's obligations under the Note and the Security Agreement. Notwithstanding anything in this Note or the Security Instrument to the contrary, no other assumption fee shall be payable upon a transfer of this Note in accordance with this Section 2.05(d), but Borrower shall pay all out-of-pocket costs and expenses incurred by Lender, including Lender's reasonable attorneys fees and expenses, incurred in connection therewith.

(e)    Repayment Upon Default. If all or any part of the principal amount of this Note is prepaid upon acceleration of this Note following the occurrence of an Event of Default prior to the Optional Prepayment Date, then, in addition to such principal payment, Borrower shall be required to make such payments ("Yield Maintenance Payments") in an amount equal to the greater of (i) one percent (1%), or (ii) the excess, if any, of (A) the aggregate respective present values of all scheduled interest and principal payments payable on each Payment Date in respect of this Note for the period from the date of such prepayment upon acceleration to the Maturity Date, discounted monthly at a rate equal to the Treasury Constant Maturity Yield Index (defined below) and based on a 360-day year of twelve 30-day months over (B) the then current outstanding principal amount of this Note.  For purposes hereof, "Treasury Constant Maturity Yield Index" shall mean the average yield for "This Week" as reported by the Federal Reserve Board in Federal Reserve Statistical Release H.15(519) ("FRB Release") published during the second full week preceding the Prepayment Date for instruments having a maturity coterminous with the remaining term of this Note.  In the event the FRB Release is no longer published, Lender shall select a comparable publication to determine the Treasury Constant Maturity Yield Index. If there is no Treasury Constant Maturity Yield Index for instruments having a maturity coterminous with the remaining term of this Note, then the weighted average yield to maturity of the Treasury Constant Maturity Yield Indices with maturities next longer and shorter than such remaining average life to maturity shall be used, calculated by averaging (and rounding upward to the nearest whole multiple of 1/100 of 1% per annum, if the average is not such a multiple) the yields of the relevant Treasury Constant Maturity Yield Indices (rounded, if necessary, to the nearest 1/100 of 1% with any figure of 1/200 of 1% or above rounded upward). The Yield Maintenance Payments to be paid in connection with any prepayment under this Section 2.05(e) shall be determined by Lender and shall be conclusive and binding on Borrower (absent manifest error). For purposes of this

Section 2.05(e), the unpaid principal amount due on this Note on the date of prepayment shall be determined after giving effect to any payment of scheduled amortization made on such date.

(f)    Release of the Mortgaged Property.    No repayment, prepayment or Defeasance of all or any portion of this Note shall cause, give rise to a right to require, or otherwise result in, the release of the real or personal property subject to the lien or mortgage created by the Security Instrument (referred to in this Section 2.05(f) as "Mortgaged Property"), except as follows:

(i)    If Borrower has elected Defeasance, and the requirements of Section 2.05(b) have been satisfied, the Mortgaged Property shall be released from the lien and mortgage created by the Security Instrument, whereupon the U.S. Government Securities pledged pursuant to the Security Agreement shall be the sole source of Borrower's collateral securing this Note. The Security Instrument shall otherwise remain in full force and effect as to provisions not pertaining to the Mortgaged Property.

(ii)    In connection with the release of the Mortgaged Property contemplated in this Section 2.05(f), Borrower shall submit to Lender, not less than thirty (30) days prior to the Defeasance Date, a release of the Mortgaged Property (and related Loan Documents approved by Lender) for execution by Lender which shall be in a form appropriate in the applicable state and otherwise satisfactory to Lender in its reasonable discretion, along with all other documentation Lender reasonably requires to be delivered by Borrower in connection with such release (collectively, "Release Instruments"), together with a certification from Borrower, in form and substance satisfactory to Lender, certifying that such documentation (A) is in compliance with all Legal Requirements, and (B) will effect such releases in accordance with the terms of this Section 2.05.

3.    SECURITY; LOAN DOCUMENTS.    The indebtedness evidenced by this Note and the obligations created hereby (including without limitation the amounts authorized by Section 4 to be collected by Lender and the Prepayment Consideration when due hereunder) are secured by, among other things, a first mortgage, security interest and lien on certain real and personal property collateral of Borrower, tangible and intangible, as described more particularly in that certain Deed of Trust and Security Agreement or Mortgage and Security Agreement, as applicable (either, "Security Instrument") from Borrower to Lender, dated as of date hereof. The Security Instrument together with this Note and all other documents to or of which Lender is a party or a beneficiary now or hereafter evidencing, securing, guarantying, modifying or otherwise relating to the indebtedness evidenced hereby, and all extensions, renewals and modifications thereof, are collectively referred to herein as the "Loan Documents."

4.    DEFAULT.

4.01    Event of Default.    The occurrence of any of the following shall constitute an event of default ("Event of Default") under this Note: (a) if any payment of principal and interest or any other payment required under this Note is not received by Lender on or before the date that is five (5) days after the date such payment is due (except that no grace period shall be provided for the payment of principal and interest due on the Maturity Date or upon acceleration

of indebtedness following the occurrence of an Event of Default); or (b) if any default should occur under any of the other Loan Documents which is not fully cured following applicable notice or prior to the expiration of any applicable grace or cure period. Upon the occurrence of an Event of Default, at Lender's option, the outstanding principal balance of this Note, together with all unpaid interest accrued thereon and all other sums due hereunder or under any other of the other Loan Documents, shall, without notice or prior demand, immediately become due and payable.

4.02   Late Charges. If any payment is not received by Lender on or before the date on which such payment originally was due (as such date may be extended by the applicable grace period, if any), then, in addition to any default interest payments due hereunder, Borrower also shall pay to Lender a late charge in an amount equal to five percent (5.0%) of the amount of such overdue payment to defray the expenses incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of the delinquent payment. Such late charge shall be immediately due and payable, without notice or demand therefor.

4.03   Default Interest Rate. If this Note is not paid in full on or before the Maturity Date or the date on which the due date of the indebtedness has been accelerated pursuant to the provisions hereof, the unpaid principal and accrued interest and other amounts then due shall bear interest at a rate per annum ("Default Interest Rate") equal to the lesser of (a) five percent (5.0%) in excess of the Interest Rate or (b) the maximum rate of interest, if any, which may be charged or collected from Borrower under applicable law. In addition, Lender shall have the right, without acceleration of the indebtedness, to collect interest at the Default Interest Rate on any payment due hereunder (including without limitation late charges and fees for legal counsel) which is not received by Lender on or before the date on which such payment originally was due (as such due date may be extended by the applicable grace period, if any). Interest at the Default Interest Rate shall be immediately due and payable from the due date specified herein and shall accrue until all Events of Default have been fully cured or full payment is received, as applicable.

4.04   Interest on Judgments.   Interest shall accrue on any judgment obtained by Lender in connection with the enforcement or collection of this Note until such judgment amount is paid in full at a rate equal to the greater of (a) the Default Interest Rate or (b) the legal rate applicable to judgments within such jurisdiction; provided, however, that interest shall not accrue at a rate in excess of the maximum rate of interest, if any, which may be charged or collected from Borrower under applicable law.

4.05   Cumulative Remedies; Attorney Fees. The remedies of Lender in this Note and in the other Loan Documents, or at law or in equity, shall be cumulative and concurrent, and may be pursued singly, successively or together in Lender's sole discretion and as often as occasion therefor shall arise. If Borrower's obligations under this Note or any of the other Loan Documents are enforced by Lender through an attorney-at-law, or any payment due under this Note or the other Loan Documents is collected by or through an attorney-at-law or collection agency, Borrower agrees to pay all costs incurred by Lender in connection therewith, including, but not limited to, reasonable fees and disbursements of legal counsel (whether with respect to a retained firm or Lender's in-house staff) and collection agency costs, whether or not suit be brought. No provision of this Section 4 shall be construed as an agreement or privilege to extend the date on which any required payment is due (subject to the applicable grace period, if any), nor as a waiver of any other right or remedy accruing

to Lender by reason of the occurrence of an Event of Default. The payments required under this Section 4 shall be in addition to, and shall in no way limit, any other rights and remedies provided for in this Note or any of the other Loan Documents, nor any other remedies provided by law or in equity, and shall be added to the principal evidenced by this Note and deemed secured by the Security Instrument and other Loan Documents.

5.    LIMITATIONS ON RECOURSE. Notwithstanding anything to the contrary contained in this Note, the liability of Borrower and of any general partner, principal or member of Borrower to pay the indebtedness evidenced by this Note and for the performance of the other agreements, covenants and obligations contained herein and in the other Loan Documents shall be limited as set forth in Article 15 of the Security Instrument.

6.    NO USURY. This Note is subject to the express condition that at no time shall Borrower be required or obligated to pay interest (or any other amount agreed to be paid hereunder which shall be deemed to be interest) at a rate which would subject Lender to either civil or criminal liability as a result of being in excess of the maximum interest rate which Borrower is permitted by applicable law to pay. If, from any circumstance whatsoever, Borrower is at any time required or obligated to pay interest (or any other amount agreed to be paid hereunder shall be deemed to be interest) at a rate in excess of such maximum rate, then the amount to be paid immediately shall be reduced to such maximum rate, and, as required by applicable law, all previous payments in excess of such maximum shall be deemed to have been payments in reduction of the principal balance owing under this Note in the inverse order of maturity (whether or not then due) or, at the option of Lender, be paid over to Borrower and not to the payment of interest. All sums paid or agreed to be paid to Lender for the use, forbearance or detention of the indebtedness evidenced hereby shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full stated term of this Note until payment in full so that the rate or amount of interest on account of said indebtedness does not exceed the maximum lawful rate of interest from time to time in effect and applicable to this Note for so long as the Note is outstanding. This Section will control all agreements between Borrower and Lender in connection with this Note.

7.    GENERAL CONDITIONS.

7.01    No Waiver by Lender. No failure to accelerate the debt evidenced hereby nor failure or delay in exercising any right or remedy upon the occurrence of an Event of Default hereunder, or any acceptance of a partial or past due payment, or indulgences granted from time to time shall be construed (a) as a novation of this Note or as a reinstatement of the indebtedness evidenced hereby, (b) as a waiver or impairment of Lender's right of acceleration or any other right or remedy available to Lender upon the occurrence of an Event of Default, or (c) as a waiver of Lender's right thereafter to insist upon strict compliance with the terms of this Note or any of the other Loan Documents; and Borrower hereby expressly waives the benefit of any statute or rule of law or equity now provided, or which may hereafter be provided, which would produce a result contrary to or in conflict with the foregoing. No extension of the time for payment of any amount due under this Note or under any of the other Loan Documents made by Lender's agreement with any person now or hereafter liable for the payment thereof shall operate to release, discharge, modify, change or affect the original liability of Borrower under this Note or any such other person, either in whole or in part unless Lender agrees otherwise in writing.

7.02 <u>Borrower's Waivers</u>. Borrower, for itself and all others who may become liable for payment of all or any part of the indebtedness evidenced by this Note, hereby waives presentment for payment, demand, protest, and notice of dishonor, protest, nonpayment, demand, intent to accelerate, and acceleration. Borrower, for itself and all others who may become liable for payment of all or any part of the indebtedness evidenced by this Note, hereby further waives and renounces, to the fullest extent permitted by law, all rights to the benefits of any moratorium, reinstatement, marshalling, forbearance, valuation, stay, extension, redemption, appraisement, exemption and homestead now or hereafter provided by the Constitution and laws of the United States of America and of each state thereof, both as to party and property (real and personal), against the enforcement and collection of the obligations evidenced by this Note or the other Loan Documents.

7.03 <u>Unconditional Payment</u>. If any payment received by Lender hereunder shall be deemed by a court of competent jurisdiction to have been a voidable preference or fraudulent conveyance under any bankruptcy, insolvency or other debtor relief law, then the obligation to make such payment shall survive any cancellation or satisfaction of this Note or return thereof to Borrower and shall not be discharged or satisfied with any prior payment thereof or cancellation of this Note, but shall remain a valid and binding obligation enforceable in accordance with the terms and provisions hereof, and such payment shall be immediately due and payable upon demand. No release of any security for this Note or any party liable for payment of this Note shall release or affect the liability of Borrower or any other party who may become liable for payment of all or any part of the indebtedness evidenced by this Note. Lender may release any guarantor, surety or indemnitor of this Note from liability, in every instance without the consent of Borrower hereunder and without waiving any rights which Lender may have hereunder or under any of the other Loan Documents or under applicable law or in equity.

7.04 <u>Authority</u>. Borrower represents that Borrower has full power, authority and legal right to execute, deliver and perform its obligations pursuant to this Note, that the execution, delivery and performance of this Note has been duly authorized, that the person executing this Note on Borrower's behalf has authority to do so, and that this Note, once executed by Borrower, constitutes the valid and binding obligation of Borrower, enforceable in accordance with its terms.

7.05 <u>Negotiable Instrument</u>. Borrower agrees that this Note shall be deemed a negotiable instrument, even though this Note, absent this paragraph, may not otherwise qualify as a negotiable instrument under applicable law.

7.06 <u>Sale of Loan by Lender</u>. Lender shall have the right to transfer, sell or assign this Note, the Security Instrument and the other Security Documents, and the Obligations hereunder.

8. <u>MISCELLANEOUS</u>.

8.01 <u>Notices</u>. All notices and other communications under this Note or under the other Loan Documents are to be in writing, addressed to the respective party as set forth in this section, and shall be deemed to have been duly given (a) upon delivery, if delivered in person with receipt acknowledged by the recipient thereof, (b) one (1) business day after having been deposited for overnight delivery, fee prepaid, with any reputable overnight courier service, or (c) three (3) business days after having been deposited in any post office or mail depository regularly maintained by the U.S.

Postal Service and sent by registered or certified mail, postage prepaid, return receipt requested. Initial addresses for each party are as follows:

| | |
|---|---|
| Borrower: | 829 Realty LLC |
| | P.O. Box 468 |
| | Parkville Station |
| | Brooklyn, New York, 11204 |
| | Attention: David Shemano |
| | |
| Lender: | GMAC Commercial Mortgage Corporation |
| | 200 Witmer Road |
| | Horsham, Pennsylvania 19044 |
| | Attn: Servicing - Executive Vice President |

Each party may establish a new address from time to time by written notice to the other given in accordance with this section; provided, however, that no such change of address will be effective until written notice thereof is actually received by the party to whom such change of address is sent. Notice to additional parties now or hereafter designated by a party entitled to notice are for convenience only and are not required for notice to a party to be effective in accordance with this section.

      8.02   Entire Agreement; Time of Essence. This Note, together with the other Loan Documents and Lender's commitment letter to Borrower, contain the entire agreements between Borrower and Lender relating to the subject matter hereof and thereof, and supersede all prior discussions and agreements (oral or written) relative hereto and thereto which are not contained herein or therein. Borrower represents and warrants that it is not relying on any promises, covenants, representations or agreements in connection with this Note or the other Loan Documents, other than as expressly set forth herein or therein. In the event of any conflict between the terms of the Loan Documents, the following order of priority shall be used to resolve such conflict: The Note shall control over the Security Instrument and the Security Instrument shall control over all other Loan Documents. Time is of the essence with respect to all provisions of this Note.

      8.03   Modification. Neither this Note nor any of the other Loan Documents may be changed, waived, supplemented, discharged or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom enforcement thereof is sought and then only to the extent expressly set forth in such writing. No person other than a duly authorized officer or agent of Lender shall be deemed an agent of Lender nor have any authority to waive, modify, supplement or terminate in any manner whatsoever any of the terms of this Note.

      8.04   Binding Effect; Joint and Several Obligations. The terms and provisions of this Note and the other Loan Documents shall be binding upon and inure to the benefit of Borrower and Lender and their respective heirs, executors, legal representatives, successors, successors and assigns, whether by voluntary action of the parties or by operation of law. The foregoing shall not be construed, however, to alter any limitations or restrictions applicable to Borrower under the other Loan Documents. If Borrower consists of more than one person or entity, each shall be jointly and severally liable to perform the obligations of Borrower under this Note and the other Loan Documents.

8.05    Unenforceable Provisions.  Any provision of this Note or the other Loan Documents which may be determined by competent authority to be prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective only to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

8.06    Ambiguity and Construction of Certain Terms.  Neither this Note nor any uncertainty or ambiguity herein shall be construed or resolved against Lender by virtue of the fact that such document has originated with Lender as drafter. Borrower acknowledges that it has reviewed this Note and has had the opportunity to consult with counsel on same. This Note, therefore, shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of the parties hereto.  All personal pronouns used herein, whether used in the masculine, feminine or neuter gender, shall be deemed to include all other genders; the singular shall include the plural and vice versa. Titles of articles and sections are for convenience only and in no way define, limit, amplify or describe the scope or intent of any provisions hereof. "Herein," "hereof" and "hereunder" and other words of similar import refer to this Note as a whole and not to any particular section, paragraph or other subdivision; "Section" refers to the entire section and not to any particular subsection, paragraph of other subdivision. Reference to days for performance shall mean calendar days unless Business Days are expressly indicated.

8.07    Governing Law.  This Note and the other Loan Documents shall be interpreted, construed and enforced according to the laws of the state in which the real property encumbered by the Security Instrument is located (without giving effect to its conflict of laws rules).

8.08    Consent to Jurisdiction.  Borrower and Lender, by its acceptance of this Note, agree and consent to the exclusive jurisdiction and venue of any state or federal court sitting in the county and state where the real property encumbered by the Security Instrument is located with respect to any legal action, proceeding, or controversy between them and hereby expressly waive any and all rights under applicable law or in equity to object to the jurisdiction and venue of said courts. Borrower further irrevocably consents to service of process by certified mail, return receipt requested, to Borrower at the address for Borrower last provided to Lender in accordance with the notice provision of this Note and agrees that such service shall be effective ten (10) days after mailing. Nothing herein shall, however, preclude or prevent Lender from bringing any one or more actions against Borrower in any other jurisdiction as may be necessary to enforce or realize upon the Security or other collateral provided for this Note.

8.09    WAIVER OF JURY TRIAL.  BORROWER HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT BORROWER MAY HAVE TO TRIAL BY JURY IN ANY LEGAL ACTION, PROCEEDING, OR COUNTERCLAIM, WHETHER IN CONTRACT, TORT OR OTHERWISE, RELATING DIRECTLY OR INDIRECTLY TO THE INDEBTEDNESS EVIDENCED BY THIS NOTE; THE APPLICATION OR COMMITMENT FOR THE LOAN EVIDENCED BY THIS NOTE; THE INTERPRETATION, CONSTRUCTION, VALIDITY, ENFORCEMENT OR PERFORMANCE OF THIS NOTE OR ANY OF THE OTHER LOAN DOCUMENTS; OR ANY ACTS OR OMISSION OF LENDER, ITS OFFICERS, EMPLOYEES, DIRECTORS OR AGENTS IN CONNECTION WITH ANY OF THE

FOREGOING.

8.10    Tax Identification Number.  Borrower represents and warrants that its current tax identification number is: 11-3595444.

**IN WITNESS WHEREOF,** Borrower has executed this Note under seal as of the date first above written.

829 Realty LLC

By: FSG Realty Associates. LLC, its Manager

By: _____

Pinchos D. Shemano, Member

## EXHIBIT A

### EXISTING NOTES

Gap Note of even date herewith by 829 Realty LLC to GMAC Commercial Mortgage Corporation in the amount of $_____.

FILED: KINGS COUNTY CLERK 08/31/2011

NYSCEF DOC. NO. 2-13

INDEX NO. 500665/2011

RECEIVED NYSCEF: 08/31/2011

**EXHIBIT J**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
-----------------------------------------------------------------X   Index No.: *500665/11*
829 REALTY LLC,                                                          Date Purchased: Aug. 17, 2011

                                        Plaintiff,

            - against -                                                  **SUMMONS**

MEIR GUTFREUND, individually and as trustee of              Venue is based on CPLR 503(a)
PD FAMILY CREDIT SHELTER TRUST,                             and 509.  Plaintiff designates
                                                            Kings County as the place of trial.
                                        Defendant.
-----------------------------------------------------------------X
To the above-named defendant:

        YOU ARE HEREBY SUMMONED to answer the verified complaint in this action and

to serve a copy of your answer or, if the verified complaint is not served with this summons, to

serve a notice of appearance on the plaintiff's attorney within 20 days after the service of this

summons, exclusive of the day of service (or within 30 days after the service is complete if this

summons is not personally delivered to you within the State of New York).  In case of your

failure to appear or answer, judgment will be taken against you by default for the relief

demanded in the verified complaint.

Dated: Uniondale, New York
        August 14, 2011

                                    WESTERMAN BALL EDERER
                                    MILLER & SHARFSTEIN, LLP

                        By:     _____
                                    Jeffrey A. Miller, Esq.
                                    1201 RXR Plaza
                                    Uniondale, New York 11556
                                    (516) 622-9200
                                    *Attorneys for Plaintiff*

TO:     Meir Gutfreund, individually and as
        trustee of PD Family Credit Shelter Trust
        1938 53rd Street
        Brooklyn, New York 11204

*{00472678}*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
-------------------------------------------------------------------X    Index No:

829 REALTY LLC,

Plaintiff,

- against -                                                  **VERIFIED COMPLAINT**

MEIR GUTFREUND, individually and as trustee of
PD FAMILY CREDIT SHELTER TRUST,

Defendant.
-------------------------------------------------------------------X

Plaintiff, by its attorneys, Westerman Ball Ederer Miller & Sharfstein, LLP, complaining

of the defendant herein, respectfully states as follows:

## THE PARTIES

1.      Plaintiff 829 Realty LLC ("Plaintiff") is a New York limited liability company.

2.      Defendant Meir Gutfreund ("Defendant") is the trustee of PD Family Credit

Shelter Trust, which is a 33% member of Plaintiff.

3.      The members of Plaintiff are:  SF Family Credit Shelter Trust (33% interest); PD

Family Credit Shelter Trust (33% interest); Ortel Plaza LLC (33% interest); and FSG Realty

Associates LLC (1% interest).

## FACTS

4.      Plaintiff is the owner of an apartment building located at 829 Greenwood Avenue,

Brooklyn, New York (the "Property").

5.      In or about May 2001, Plaintiff borrowed the principal sum of $8,000,000.00

from GMAC Commercial Mortgage Corp. (the "Loan").

6.      The Loan is secured by a mortgage on the Property.

7.      The maturity date of the Loan was June 5, 2011.

8.    Prior to the maturity date, Plaintiff began negotiations with Flushing Savings Bank ("FSB") to refinance the Loan.

9.    On or about April 22, 2011, FSB provided Plaintiff with a commitment letter regarding the refinancing of the Loan.

10.    On or about May 23, 2011, Defendant, on behalf of PD Family Credit Shelter Trust, filed in the Office of the City Register of the City of New York a Certificate of Declaration (the "Certificate"), objecting to, among other things, any refinancing of the Property without Defendant's written consent.

11.    Neither FSB nor any other lender would close on a refinancing unless the Certificate was cancelled, which Defendant refused to do despite demand.

12.    The Certificate is improper and should be cancelled.

13.    Neither Defendant's consent nor the consent of PD Family Credit Shelter Trust was or is required to approve the refinancing of the Loan.

14.    Under the terms of the Operating Agreement, in order to approve the refinancing, all that is required is the affirmative vote of members holding a simple majority (over 50 percent) of the membership interests.

15.    All of the members other than PD Family Credit Shelter Trust have approved the refinancing of the Property.

16.    Since members holding more than 50% of the membership interests approve the refinancing of the Loan, Defendant's consent (and/or the consent of PD Family Credit Shelter Trust) to refinance the Property was not and is not required.

17.    The Certificate has created a cloud on the title of the Property.

18.    The Certificate is preventing Plaintiff from refinancing the Property (with FSB or

2

any other lender) and otherwise causing harm to Plaintiff including, without limitation, the accrual of default interest on the Loan.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Cancellation of Certificate)

19.    Plaintiff incorporates the foregoing paragraphs of this Verified Complaint by reference as if the same were set forth at length herein.

20.    Pursuant to Section 329 of the Real Property Law, "an owner of real property or of any undivided part thereof or interest therein . . . may maintain an action to have any recorded instrument in writing relating to such real property or interest therein, other than those required by law to be recorded, . . . declared void or invalid, or to have the same canceled of record as to said real property."

21.    Plaintiff is the owner of the Property.

22.    The Certificate has been recorded against the Property.

23.    The Certificate is not required by law to be recorded.

24.    The Certificate is not entitled to be recorded under Section 291 of the Real Property Law or under any other statute, rule or regulation.

25.    The Certificate has placed a cloud on title to the Property and is preventing Plaintiff from refinancing the Property.

26.    As a direct and proximate result of Defendant's conduct, Plaintiff is suffering harm.

27.    Plaintiff has no adequate remedy at law.

28.    Plaintiff is entitled to an order: (i) directing the New York City Registrar to immediately cancel and vacate the Certificate of record as against the Property; and (ii) awarding Plaintiff all sums incidental to Defendant's misconduct.

3

## AS AND FOR A SECOND CAUSE OF ACTION
### (Breach of Fiduciary Duty)

29.     Plaintiff incorporates the foregoing paragraphs of this Verified Complaint by reference as if the same were set forth at length herein.

30.     Defendant owes a fiduciary duty to Plaintiff.

31.     Defendant has breached its fiduciary duty to Plaintiff by, among other things, recording the Certificate, refusing to vacate the Certificate, and interfering with Plaintiff's ability to refinance the Loan.

32.     As a direct and proximate result of Defendant's conduct, Plaintiff is suffering harm.

33.     Plaintiff has no adequate remedy at law.

34.     Defendant's actions are willful, wanton and outrageous, and warrant the imposition of punitive damages.

**WHEREFORE**, Plaintiff demands judgment against Defendant as follows:

a.     On the first cause of action, for an order (i) directing the New York City Registrar to immediately cancel and vacate the Certificate of record as against the Property; and (ii) awarding Plaintiff all sums incidental to Defendant's misconduct;

b.     On the second cause of action, for an order (i) directing the New York City Registrar to immediately cancel and vacate the Certificate of record as against the Property; (ii) awarding Plaintiff all sums incidental to Defendant's misconduct; and (iii) imposing punitive damages against Defendant in an amount to be determined at trial; and

4

        c.      On all causes of action, for an award of the costs, disbursements, counsel

fees, and other expenses incurred by Plaintiff in this action, together with such other and further

relief as the Court deems just and proper.

Dated: Uniondale, New York
       August 14, 2011

                                WESTERMAN BALL EDERER
                                MILLER & SHARFSTEIN, LLP


By:      _____
                    Jeffrey A. Miller, Esq.
                    1201 RXR Plaza
                    Uniondale, New York 11556
                    (516) 622-9200
                    *Attorneys for Plaintiff*

472691

5

## VERIFICATION

Shaindel Finkelstein affirms under penalty of perjury as follows:

I am a Trustee of the SF Family Credit Shelter Trust, a member of the plaintiff herein.  I have read the foregoing Verified Complaint and know the contents thereof and the same are true to my knowledge, except those matters therein which are stated to be alleged upon information and belief, and as to those matters I believe them to be true.

SHAINDEL FINKELSTEIN

Affirmed to before me this
14ᵗʰ day of _Avqvst_ , 2011

Notary Public

GEDALIA MARYL
Notary Public · State of New York
No. 01MA6226310
Qualified in Kings County
My Commission Expires August 9, 20 14

6

## VERIFICATION

Israel Finkelstein affirms under penalty of perjury as follows:

I am the manager of Ortel Plaza LLC, a member of the plaintiff herein. I have read the foregoing Verified Complaint and know the contents thereof and the same are true to my knowledge, except those matters therein which are stated to be alleged upon information and belief, and as to those matters I believe them to be true.

_____
ISRAEL FINKELSTEIN

Affirmed to before me this
14th day of _August_ , 2011

_____
Notary Public

GEDALIA MARYL
Notary Public · State of New York
No. 01MA6226310
Qualified in Kings County
My Commission Expires August 9, 2014

7

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
-------------------------------------------------------------------X    Index No:  500665/2011
829 REALTY LLC,

                                    Plaintiff,

            - against -

MEIR GUTFREUND, individually and as trustee of
PD FAMILY CREDIT SHELTER TRUST,

                                    Defendant.
-------------------------------------------------------------------X


### NOTICE OF MOTION AND SUPPORTING PAPERS


*WESTERMAN BALL EDERER MILLER & SHARFSTEIN, LLP*
1201 RXR Plaza
Uniondale, New York 11556
(516) 622-9200
*Attorneys for Plaintiff*

| To | Service of a copy of the within is hereby admitted. |
|----|-----------------------------------------------------|
|    | Dated:................................................    ......... |
| Attorney(s) for | ............................................................................ |

FILED: KINGS COUNTY CLERK 08/31/2011

NYSCEF DOC. NO. 2-14

INDEX NO. 500665/2011

RECEIVED NYSCEF: 08/31/2011

| STATE OF NEW YORK | COUNTY OF KINGS | INDEX # : _____11-500665_____ |
|---|---|---|

**SUPREME COURT**
**DISTRICT:**

Date Filed: _____August 17, 2011_____

ATTORNEY(S): : Westerman Ball Ederer Miller & Sharfstein LLP   PH: 516-622
ADDRESS: 1201 RXR Plaza 12th Flr. Uniondale NY 11556   File No.: 8132-1

*9/20/11*

*829 Realty LLC,*

*vs*

Plaintiff(s)/Petitioner(s)

*Meir Gutfreund, et al*

Defendant(s)/Respondent(s)

STATE OF NEW YORK, COUNTY OF NASSAU, SS.:                **AFFIDAVIT OF SERVICE**

_____Thomas G. Russo_____, being duly sworn deposes and says: Deponent is not a party herein, is over 18 years
of age and resides in New York State. On _____August 25, 2011_____ at _____7:25 pm_____,
at _____1938 53rd Street, Brooklyn, NY 11204_____, deponent served the within
_____Notice of Motion with Supporting Documents & RJI_____
_____Summons and Verified Complaint_____
on: __Meir Gutfreund, Individually and as trustee of PD Family Credit Shelter Trust__, _____Defendant_____ therein named.
The index number and the filing date of the action were endorsed upon the face of the papers so served herein.

**#1 INDIVIDUAL**
**[X]** By delivering a true copy of each to said recipient personally; deponent knew the person served to be the person described as said person therein.

**#2   ENTITY**
**☐** By delivering thereat a true copy of each to_____personally, deponent knew the person so served to be the_____ of the entity authorized to accept service on behalf of the entity.

**#3 SUITABLE**
**AGE PERSON** By delivering a true copy of each to_____ a person of suitable age and discretion.
**☐** Said premises is recipient's: [ ] actual place of business   [ ] dwelling house (usual place of abode) within the state.

**#4 AFFIXING**
**TO DOOR** By affixing a true copy of each to the door of said premises, which is recipient's:[ ] actual place of business   [ ] dwelling house
**☐** (place of abode) within the state.

Deponent was unable, with due diligence to find recipient or a person of suitable age and discretion, having called thereat

| on the | _____ | day of | _____ | at | _____ |
|---|---|---|---|---|---|
| on the | _____ | day of | _____ | at | _____ |
| on the | _____ | day of | _____ | at | _____ |
| on the | _____ | day of | _____ | at | _____ |

Address confirmed by_____

**#5 MAIL COPY** On _____, deponent completed service by depositing a true copy of each document to the above address in a 1st Class postpaid properly addressed envelope marked "Personal and Confidential" in an official depository under the exclusive care and custody of the United States Post Office in the State of New York.

**#6 DESCRIPTION** A description of the Defendant, or other person served, or spoken to on behalf of the Defendant is as follows:
**[X]** Sex: __Male__   Color of skin: __White__   Color of hair: __Gray__   Age: __51 - 65 Yrs.__   Height: __5' 9" - 6' 0"__
(use with #1, 2 or 3) Weight: __161 - 200 Lbs.__   Other Features: __Beard__

**#7 WIT FEES** the authorized witness fee and / or traveling expenses were paid (tendered) to the recipient.

**#8 MILITARY SRVC** Deponent asked person spoken to whether the recipient was presently in military service of the United States Government or of the State
**[X]** of New York and was informed that recipient was not. Recipient wore ordinary civilian clothes and no military uniform.

**#9 OTHER**

Sworn to before me on _____August 26, 2011_____

PATRICIA ROTHFRITZ
NOTARY PUBLIC, State of New York
01R06055503, Qualified in Nassau County
Commission Expires February 26, 2015

Thomas G. Russo
Server's Lic # 1076023
InvoiceWork Order 1110954

*INTERCOUNTY JUDICIAL SERVICES, 85 WILLIS AVENUE, SUITE F, MINEOLA, NY 11501, PH. 516-248-8270, FAX 516-294-6225*

# REQUEST FOR JUDICIAL INTERVENTION
#### UCS-840   (3/2011)

| | For Court Clerk Use Only: |
|---|---|
| | IAS Entry Date |
| __Supreme__ _____COURT, COUNTY OF__Kings_____ | |
| | Judge Assigned |
| Index No: __500665/11_____ Date Index Issued:__08/17/2011_____ | |
| | RJI Date |

**CAPTION:** Enter the complete case caption. Do not use et al or et ano. If more space is required, attach a caption rider sheet.

829 REALTY LLC,

**Plaintiff(s)/Petitioner(s)**

-against-

MEIR GUTFREUND, individually and as trustee of PD FAMILY CREDIT SHELTER TRUST

**Defendant(s)/Respondent(s)**

## NATURE OF ACTION OR PROCEEDING:    Check ONE box only and specify where indicated.

**MATRIMONIAL**
- ○ Contested
- ○ Uncontested
  - **NOTE:** For all Matrimonial actions where the parties have children under the age of 18, complete and attach the **MATRIMONIAL RJI Addendum.**

**TORTS**
- ○ Asbestos
- ○ Breast Implant
- ○ Environmental: _____
  - (specify)
- ○ Medical, Dental, or Podiatric Malpractice
- ○ Motor Vehicle
- ○ Products Liability:_____
  - (specify)
- ○ Other Negligence:_____
  - (specify)
- ○ Other Professional Malpractice:_____
  - (specify)
- ○ Other Tort:_____
  - (specify)

**COMMERCIAL**
- ○ Business Entity (including corporations, partnerships, LLCs, etc.)
- ○ Contract
- ○ Insurance (where insurer is a party, except arbitration)
- ○ UCC (including sales, negotiable instruments)
- ◉ Other Commercial: Breach of Fiduciary Duty
  - (specify)
  - **NOTE:** For Commercial Division assignment requests [22 NYCRR § 202.70(d)], complete and attach the **COMMERCIAL DIV RJI Addendum.**

**REAL PROPERTY:**    How many properties does the application include? _____
- ○ Condemnation
- ○ Foreclosure
- Property Address: _____ Alabama
  - Street Address    City    State    Zip
  - **NOTE:** For Foreclosure actions involving a one- to four-family, owner-occupied, residential property, or an owner-occupied condominium, complete and attach the **FORECLOSURE RJI Addendum.**
- ○ Tax Certiorari - Section: _____ Block: _____ Lot: _____
- ○ Other Real Property:_____
  - (specify)

**OTHER MATTERS**
- ○ Certificate of Incorporation/Dissolution    [see **NOTE** under Commercial]
- ○ Emergency Medical Treatment
- ○ Habeas Corpus
- ○ Local Court Appeal
- ○ Mechanic's Lien
- ○ Name Change
- ○ Pistol Permit Revocation Hearing
- ○ Sale or Finance of Religious/Not-for-Profit Property
- ○ Other:_____
  - (specify)

**SPECIAL PROCEEDINGS**
- ○ CPLR Article 75 (Arbitration)    [see **NOTE** under Commercial]
- ○ CPLR Article 78 (Body or Officer)
- ○ Election Law
- ○ MHL Article 9.60 (Kendra's Law)
- ○ MHL Article 10 (Sex Offender Confinement-Initial)
- ○ MHL Article 10 (Sex Offender Confinement-Review)
- ○ MHL Article 81 (Guardianship)
- ○ Other Mental Hygiene:_____
  - (specify)
- ○ Other Special Proceeding:_____
  - (specify)

## STATUS OF ACTION OR PROCEEDING:    Answer YES or NO for EVERY question AND enter additional information where indicated.

| | YES | NO | |
|---|---|---|---|
| Has a summons and complaint or summons w/notice been filed? | ◉ | ○ | If yes, date filed: __08/17/2011_____ |
| Is this action/proceeding being filed post-judgment? | ○ | ◉ | If yes, judgment date: _____ |

## NATURE OF JUDICIAL INTERVENTION:    Check ONE box only AND enter additional information where indicated.

- ○ Infant's Compromise
- ○ Note of Issue and/or Certificate of Readiness
- ○ Notice of Medical, Dental, or Podiatric Malpractice    Date Issue Joined: N/A
- ● Notice of Motion    Relief Sought: Miscellaneous    Return Date: 09/20/2011
- ○ Notice of Petition    Relief Sought: Alternate Service    Return Date: _____
- ○ Order to Show Cause    Relief Sought: Alternate Service    Return Date: _____
- ○ Other Ex Parte Application    Relief Sought: Alternate Service
- ○ Poor Person Application
- ○ Request for Preliminary Conference
- ○ Residential Mortgage Foreclosure Settlement Conference
- ○ Writ of Habeas Corpus
- ○ Other  (specify): _____

## RELATED CASES:    List any related actions. For Matrimonial actions, include any related criminal and/or Family Court cases.
If additional space is required, complete and attach the RJI Addendum. If none, leave blank.

| Case Title | Index/Case No. | Court | Judge (if assigned) | Relationship to Instant Case |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

## PARTIES:    If additional space is required, complete and attach the RJI Addendum.
For parties without an attorney, check "Un-Rep" box AND enter party address, phone number and e-mail address in "Attorneys" space.

| Un-Rep | Parties: List parties in caption order and indicate party role(s) (e.g. defendant; 3rd-party plaintiff). | Attorneys: Provide name, firm name, business address, phone number and e-mail address of all attorneys that have appeared in the case. | Issue Joined (Y/N): | Insurance Carrier(s): |
|---|---|---|---|---|
| ☐ | 829 REALTY LLC (Last Name) Primary Role: Plaintiff Secondary Role (if any): Plaintiff | Lyons (Last Name)    Daniel (First Name) Westerman Ball Ederer Miller & Sharfstein, LLP (Firm Name) 1201 RXR Plaza (Street Address)  Uniondale (City)  New York (State)  11556 (Zip) +1 (516) 622-9200 (Phone)  +1 (516) 622-9212 (Fax)  dlyons@westermanllp.com (e-mail) | ● YES  ○ NO |  |
| ☐ | Meir Gutfreund, Individually and as (Last Name) Trustee of PD Family Credit Shelter Trust (First Name) Primary Role: Defendant Secondary Role (if any): Defendant | (Last Name)  (First Name) (Firm Name) (Street Address)  (City)  New York (State)  (Zip) (Phone)  (Fax)  (e-mail) | ● YES  ○ NO |  |
| ☐ | (Last Name) (First Name) Primary Role: Defendant Secondary Role (if any): Defendant | (Last Name)  (First Name) (Firm Name) (Street Address)  (City)  New York (State)  (Zip) (Phone)  (Fax)  (e-mail) | ● YES  ○ NO |  |
| ☐ | (Last Name) (First Name) Primary Role: Defendant Secondary Role (if any): Defendant | (Last Name)  (First Name) (Firm Name) (Street Address)  (City)  New York (State)  (Zip) (Phone)  (Fax)  (e-mail) | ● YES  ○ NO |  |

I AFFIRM UNDER THE PENALTY OF PERJURY THAT, TO MY KNOWLEDGE, OTHER THAN AS NOTED ABOVE, THERE ARE AND HAVE BEEN NO RELATED ACTIONS OR PROCEEDINGS, NOR HAS A REQUEST FOR JUDICIAL INTERVENTION PREVIOUSLY BEEN FILED IN THIS ACTION OR PROCEEDING.

Dated: 08/18/2011

SIGNATURE

4203733

ATTORNEY REGISTRATION NUMBER

Daniel G. Lyons

PRINT OR TYPE NAME

Print Form

Print Form

**SUPREME COURT OF THE STATE OF NEW YORK**

UCS-840C
3/2011

COUNTY OF Kings _____ x

829 REALTY LLC

Plaintiff(s)/Petitioner(s)

-against-

Meir Gutfreund, individually, et al.

Defendant(s)/Respondent(s)
_____ x

Index No. **500665/11** _____

RJI No. (if any) _____

**COMMERCIAL DIVISION**
Request for Judicial Intervention Addendum

**COMPLETE WHERE APPLICABLE** [add additional pages if needed]:

**Plaintiff/Petitioner's cause(s) of action** [check all that apply]:

☒ Breach of contract or fiduciary duty, fraud, misrepresentation, business tort (e.g. unfair competition), or statutory and/or common law violation where the breach or violation is alleged to arise out of business dealings (e.g. sales of assets or securities; corporate restructuring; partnership, shareholder, joint venture, and other business agreements; trade secrets; restrictive covenants; and employment agreements not including claims that principally involve alleged discriminatory practices)

☐ Transactions governed by the Uniform Commercial Code (exclusive of those concerning individual cooperative or condominium units)

☒ Transactions involving commercial real property, including Yellowstone injunctions and excluding actions for the payment of rent only

☐ Shareholder derivative actions — without consideration of the monetary threshold

☐ Commercial class actions — without consideration of the monetary threshold

☐ Business transactions involving or arising out of dealings with commercial banks and other financial institutions

☐ Internal affairs of business organizations

☐ Malpractice by accountants or actuaries, and legal malpractice arising out of representation in commercial matters

☐ Environmental insurance coverage

☐ Commercial insurance coverage (e.g. directors and officers, errors and omissions, and business interruption coverage)

☐ Dissolution of corporations, partnerships, limited liability companies, limited liability partnerships and joint ventures — without consideration of the monetary threshold

☐ Applications to stay or compel arbitration and affirm or disaffirm arbitration awards and related injunctive relief pursuant to CPLR Article 75 involving any of the foregoing enumerated commercial issues — without consideration of the monetary threshold

**Plaintiff/Petitioner's claim for compensatory damages** [exclusive of punitive damages, interest, costs and counsel fees claimed]:

$ _____

**Plaintiff/Petitioner's claim for equitable or declaratory relief** [brief description]:

This action involves commercial real property. Plaintiff's complaint includes causes of action for breach of fiduciary duty, and to have a "certificate" (which was recorded against plaintiff's commercial property) canceled of record.

**Defendant/Respondent's counterclaim(s)** [brief description, including claim for monetary relief]:

**I REQUEST THAT THIS CASE BE ASSIGNED TO THE COMMERCIAL DIVISION. I CERTIFY THAT THE CASE MEETS THE JURISDICTIONAL REQUIREMENTS OF THE COMMERCIAL DIVISION SET FORTH IN 22 NYCRR § 202.70(a), (b) AND (c).**

Dated: 08/18/2011 _____

_____
SIGNATURE

Daniel G. Lyons _____
PRINT OR TYPE NAME

FILED: KINGS COUNTY CLERK 09/01/2011 Case 1:12-01148 # Doc 1-2 Filed 04/30/12 Entered 04/30/12 11:35:16 INDEX NO. 500665/2011

NYSCEF DOC. NO. 1                                                                    RECEIVED NYSCEF: 09/01/2011

| STATE OF NEW YORK | COUNTY OF KINGS | INDEX #: 11-500665 |
|---|---|---|

**SUPREME COURT**
**DISTRICT:**

Date Filed: **August 17, 2011**

ATTORNEY(S): : Westerman Ball Ederer Miller & Sharfstein LLP    PH: 516-622
      ADDRESS: 1201 RXR Plaza 12th Flr. Uniondale NY 11556    File No.: 8132-1

*829 Realty LLC,*

*Plaintiff(s)/Petitioner(s)*

*vs*

*Meir Gutfreund, et al*

*Defendant(s)/Respondent(s)*

STATE OF NEW YORK, COUNTY OF NASSAU, SS.:

**AFFIDAVIT OF SERVICE**

_____Thomas G. Russo_____, being duly sworn deposes and says: Deponent is not a party herein, is over 18 years

of age and resides in New York State. On ___August 25, 2011___ at ___7:25 pm___

at _____1938 53rd Street, Brooklyn, NY 11204_____, deponent served the within

_____Summons and Verified Complaint_____

on: __Meir Gutfreund, individually and as trustee of PD Family Credit Shelter Trust__, ____Defendant____ therein named.
The index number and the filing date of the action were endorsed upon the face of the papers so served herein.

**#1 INDIVIDUAL** By delivering a true copy of each to said recipient personally; deponent knew the person served to be the person described as said person
[X]    therein.

**#2    ENTITY**
[ ]    By delivering thereat a true copy of each to _____ personally, deponent knew the person so served
      to be the_____ of the entity authorized to accept service on behalf of the entity.

**#3 SUITABLE**
**AGE PERSON** By delivering a true copy of each to_____ a person of suitable age and discretion.
[ ]    Said premises is recipient's: [ ] actual place of business    [ ] dwelling house (usual place of abode) within the state.

**#4 AFFIXING** By affixing a true copy of each to the door of said premises, which is recipient's: [ ] actual place of business    [ ] dwelling house
**TO DOOR** (place of abode) within the state.
[ ]

Deponent was unable, with due diligence to find recipient or a person of suitable age and discretion, having called thereat

on the _____ day of _____    at _____
on the _____ day of _____    at _____
on the _____ day of _____    at _____
Address confirmed by_____.

**#5 MAIL COPY** On _____, deponent completed service by depositing a true copy of each document to the above address
[ ]    in a 1st Class postpaid properly addressed envelope marked "Personal and Confidential" in an official depository under the exclusive care
      and custody of the United States Post Office in the State of New York.

**#6 DESCRIPTION** A description of the Defendant, or other person served, or spoken to on behalf of the Defendant is as follows:
[X]    Sex: __Male__    Color of skin: __White__    Color of hair: __Gray__    Age: __51 - 65 Yrs.__    Height: __5' 9" - 6' 0"__
(use with #1, 2 or 3) Weight: __161 - 200 Lbs.__    Other Features: __Beard__

**#7 WIT. FEES** the authorized witness fee and / or traveling expenses were paid (tendered) to the recipient.
[ ]

**#8 MILITARY SRVC** Deponent asked person spoken to whether the recipient was presently in military service of the United States Government or of the State
[X]    of New York and was informed that recipient was not. Recipient wore ordinary civilian clothes and no military uniform.

**#9 OTHER**
[ ]

Sworn to before me on ___August 26, 2011___

PATRICIA ROTHFRITZ
NOTARY PUBLIC, State of New York
01R06055503, Qualified in Nassau County
Commission Expires February 26, 2015

Thomas G. Russo
Server's Lic # 1076023
Invoice Work Order 1110954

*INTERCOUNTY JUDICIAL SERVICES, 85 WILLIS AVENUE, SUITE F, MINEOLA, NY 11501, PH. 516-248-8270, FAX 516-294-6225*